WARREN B. STURRUP, BY HIS GUARDIAN AND NEXT FRIEND,
LAMOUNT H. STURRUP *v.* ROBERT M. MAHAN, PRINCIPAL
OF UNIVERSITY JUNIOR-SENIOR HIGH SCHOOL, PHIL N. ESKEW,
COMMISSIONER OF THE INDIANA HIGH SCHOOL ATHLETIC
ASSOCIATION.

[No. 174S14. Filed January 21, 1974.]

*David S. McCrea,* of Bloomington, for appellant.

*Harold J. Bell, Mark E. Bell, Bell & Bell,* of Indianapolis,
for Phil N. Eskew and Indiana High School Athletic Association.

*Len E. Bunger, Snyder, Bunger, Corner, Harrel & Robertson,* of Bloomington, for Robert M. Mahan.

HUNTER, J.——This action was brought on behalf of Warren
B. Sturrup by his appointed legal guardian against Robert
M. Mahan, as principal of University Junior-Senior High
School, Bloomington, and Phil N. Eskew, as Commissioner
of the Indiana High School Athletic Association. Sturrup
moved from Miami, Florida, to Bloomington, Indiana, in the

summer. of 1971, to live with his brother, due to alleged "demoralizing and detrimental conditions" of his home and school environment in Florida.[1] He was subsequently denied eligibility to participate in athletics at his new high school in Bloomington. Sturrup's ineligibility was founded on the rules of the IHSAA as interpreted by the defendants.[2] These rules are as follows:

IHSAA Rule 12, Section 1

"No student, who has been enrolled as a high school student in any member school, shall be permitted to participate in any inter-school contest as a member of another member school until he has been enrolled in such school for one calendar year, unless the parents of such student actually change their residence to the second school district. In the latter case, the student will be as eligible as he was in the school from which he withdrew."

Rule 22, Sections 3 and 6

"Section 3—If a student transfers from one member school to another member school and his parents actually change their residence to the second school district, he shall be as eligible as he was in the school from which he withdrew."

"*Section 6—Unavoidable Change of Residence.* A student who, because of unavoidable circumstances such as the death of the parents or guardian, finds it necessary to change residence from one school district to another in order to have a home, may be declared eligible by the Board of Control, provided the principal of each member school files a statement, with supporting evidence, with the Board of Control as proof that the change was necessary and that no undue influence was attached to the case in any way. If any action of a legal agency is to be submitted as evidence of unavoidable change of residence, such action should be taken prior to the student's enrollment in the new school."

---

1. The record discloses the following facts:
   (1). Warrens's friends were involved with drugs.
   (2) Fellow athletes were using drugs.
   (3) Warren could not study at home.
   (4) Warren lived in a two-bedroom house with his parents and ten sisters.
   (5) Warren's mother has a heart condition.

2. Although these rules do not explicitly refer to out-of-state transferees, they are given a broad interpretation so as to comprehend said transferees, and have been so applied.

Plaintiff sought a preliminary injunction, restraining defendants from declaring him ineligible to participate in varsity athletics. The preliminary injunction was denied by the trial court.

Plaintiff appealed to the Court of Appeals, Third District, where the judgment was reversed in an opinion by Judge Hoffman, with Staton, J., concurring, and Sharp, J., dissenting with opinion.

Although the issue of *Warren Sturrup's* eligibility has been mooted by the passage of time, we have granted transfer in order to correct a fundamental error in the Court of Appeals' opinion.

The Court of Appeals concluded that the above-mentioned IHSAA bylaws unconstitutionally burdened Warren Sturrup's fundamental right to travel among the states. More specifically, the Court of Appeals held that Warren Sturrup was denied equal protection of the laws as guaranteed by the 14th Amendment to the United States Constitution. The Court of Appeals' constitutional analysis can be summarized as follows:

The Equal Protection Clause does not prevent reasonable classifications created by the State. The IHSAA bylaws constitute State action within the meaning of the 14th Amendment. Usually, a showing of reasonableness is sufficient to sustain a legislative or administrative classification. However, if the classification is based upon suspect criteria (race, religion, alienage) or impinges upon a fundamental right, mere reasonableness will not suffice. The burden shifts to the State to demonstrate a *compelling* State interest and a *necessary* relation between the classification and that interest. In this case the compelling State interest or high scrutiny model applies. Sturrup was exercising his fundamental right to travel among the states. The State has failed to establish a compelling State interest and the bylaws' necessary relation to the furtherance of that interest. Therefore, the bylaws deny Sturrup the equal protection of the laws.

We do agree with the Court of Appeals' assessment of equal protection methodology. However, we do not agree with its application in the case at bar.

The Equal Protection Clause of the 14th Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The threshold inquiry, whenever equal protection of the laws is alleged to have been denied, is whether there is a burden distributed by the State to one group and not another. If, and only if, dissimilar treatment exists, the equal protection analysis applied by the Court of Appeals is triggered. Otherwise, there is no need to proceed with the equal protection analysis, because the existence of an equal protection violation is precluded.

The decision of the Court of Appeals is largely predicated on the United States Supreme Court's holdings in *Shapiro* v. *Thompson* (1969), 394 U.S. 618, 22 L. Ed. 2d 600, and *Dunn* v. *Blumstein* (1972), 405 U.S. 330, 31 L. Ed. 2d 274. In those cases durational requirements for receiving welfare benefits and for voting were struck down on the ground that such requirements impinged upon the fundamental right to travel *interstate*. The Supreme Court was entirely justified in invoking the standard equal protection methodology, not merely because there was a legislative classification and a fundamental right involved, but because those similarly situated were not treated similarly. That is to say, in both cases, some individuals who sought to realize the benefits of the system (welfare in *Shapiro*, voting in *Dunn*) were treated differently than others similarly situated.

In essence, those who came from out-of-state were faced with the durational requirements, while those living in the state were not.

The *Shapiro* and *Dunn* cases can clearly be distinguished from the case at bar. In this case, all transferees (those transferring *intra* and *inter* state) are subject to ineligibility,

unless they can bring themselves within one of the stated exceptions to Rule 12, Section 1, and Rule 22, Sections 3 and 6 (actual change of parental residence or unavoidable circumstances). In *Shapiro* and *Dunn* only those who came from out-of-state were penalized; the durational requirements were expressly designed to discriminate against immigrants. Here, no such discrimination exists.

If, pursuant to his foregoing argument, we were to conclude that Warren Sturrup was denied equal protection of the laws, we would be giving an unintended, even bizarre, meaning to the Equal Protection Clause. The Equal Protection Clause should be read in conjunction with Article 4, § 2, of the United States Constitution which reads as follows:

> "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

The Privileges and Immunities Clause was "designed to insure to a citizen of State A who ventures into State B the *same* privileges which the citizens of State B enjoy." *Toomer* v. *Witsell* (1948), 334 U.S. 385, 92 L. Ed. 1460, 1471, (emphasis added). An individual moving from State A to State B is "entitled under the Federal Constitution to all the privileges and immunities of citizens of that State; but under that Constitution he can claim *no more.*" *City of Detroit* v. *Osborne* (1890), 135 U.S. 492, 34 L. Ed. 260, 262, (emphasis added).

When these two provisions are read together, it becomes abundantly clear that the Equal Protection Clause mandates *equal* treatment. Any treatment which deviates from this norm is constitutionally suspect. In the case at bar, if out-of-state transferees were denied eligibility for *two* years after transferring, as compared to one year for in-state transferees, the out-of-staters would unquestionably be the recipients of *unequal* treatment. It is highly conceivable that such a provision would be violative of both the Equal Protection and Privileges and Immunities Clauses. On the other

hand, if out-of-state transferees were granted instant eligibility, while those transferring within the state were faced with a one-year durational requirement, the in-state transferees would be receiving *less* than *equal* protection of the laws. The Equal Protection and Privileges and Immunities Clauses require *equal* treatment and Warren Sturrup received such treatment.

Notwithstanding the invalidity of appellant's foregoing argument, the bylaws in question nonetheless suffer from a serious constitutional infirmity.

The objective of the IHSAA bylaws regarding transferee eligibility is to preserve the integrity of interscholastic athletics by minimizing recruitment, proselyting, and school "jumping" for athletic reasons. We believe that such practices at the high school level are despicable and odious and should, if possible, be eliminated by any reasonable method available. These transferee eligibility bylaws are *reasonably* related to the above-stated objective. That is to say, they are designed to and do, in fact, contribute to the realization of that goal. However, said bylaws are *unreasonable* in that they sweep too broadly in their proscription and, hence, violate the Equal Protection Clause of the 14th Amendment. IHSAA Rules 12 (Section 1) and 22 (Sections 3 and 6) limit eligibility to those who move with their parents free of undue influence and to those whose move is necessitated by "unavoidable circumstances" free of undue influence. All other transferring student-athletes, who cannot bring themselves within one of the above two categories, are *automatically* denied the opportunity to participate in interscholastic athletics for a period of one year. The bylaws, in essence, create an irrebuttable conclusion of law that all other transferees have been the victims of unscrupulous practices. This is precisely where the rules sweep too broadly, they create an over-inclusive class—those who move from one school to another for reasons wholly unrelated to athletics are grouped together with those who have been recruited or who

have "jumped" for athletic reasons. In short, the purported objective of the transferee eligibility rules is to prevent the use of undue influence and school "jumping," but their practical effect is to severely limit the transferee eligibility in general. The rules as presently constituted penalize a student-athlete who wishes to transfer for academic or religious reasons or for any number of other legitimate reasons. Surely, denying eligibility to such transferees in no way furthers IHSAA objectives.

After reviewing the IHSAA bylaws and the record of proceedings, we are unable to discern *any* basis in fact or law for declaring Warren Sturrup ineligible. The record discloses the following uncontroverted facts and sequence of events:

Warren Sturrup moved from Miami, Florida, to Bloomington, Indiana. The uncontroverted purpose of the move was to avoid "demoralizing and detrimental conditions" of his home and school environment in Florida. Those conditions included living in a two-bedroom house with twelve other people and the wide-spread use of narcotics among his peers in Miami Palmetto High School.

Warren's brother, Lamount, an adult person living in Bloomington, was appointed Warren's legal guardian by the Monroe Circuit Court. School authorities approved the guardianship and Warren enrolled at University Junior-Senior High School. He was subsequently declared ineligible by the school's principal, Robert Mahan, after conferring with Commissioner Eskew.

Rule 12, Section 16, Q. 10 of the IHSAA Constitution and Bylaws reads as follows:

"Q. 10.   Are legal guardians considered as parents in the IHSAA?

"A.   Legal guardians may be considered as parents if the guardianship papers issued by an authorized court are submitted and approved, and if the student has been living with the guardian. The Board of Control reserves the right to check and act on the circumstances of a guardianship at all times."

This provision expressly recognizes the doctrine of *in loco parentis*.[3] However, the IHSAA did not recognize that provision's validity in the case at bar. Commissioner Eskew, upon direct examination, explained that *in loco parentis* is applicable only if "other requirements . . . such as unavoidable change" have been satisfied. The IHSAA took the position that those "other requirements" were not met and that consequently Warren had failed to qualify under the parental change of residence and the unavoidable circumstances exceptions. We can conceive of no rational reason for distinguishing between natural parents and legal guardians with respect to transferee eligibility. Notwithstanding Commissioner Eskew's explanation, the IHSAA's decision to deny Warren Sturrup eligibility—in the absence of any evidence of "undue influence"—can only be viewed as patently arbitrary and capricious, and must be reserved.

DeBruler, Given and Prentice, JJ., concur; Arterburn, C.J., dissents with opinion.

## DISSENTING OPINION

ARTERBURN, C.J.—There is always a temptation for a court to think that it knows better what is good for party litigants than the administrative body or legislature which fixes rules of conduct. As I said in a previous opinion involving the same type of question as here,

"We are judges, not school board members or athletic officials. We should avoid substituting our judgment for that of officials and parties possessing special knowledge of school conditions. We, as judges, should not sit on the school board."

*Hass* v. *South Bend Community School Corp.* (1972), 259 Ind. 515, at 530, 289 N. E. 2d 495, at 502 (dissenting).

3. An individual is said to stand *in loco parentis* when he assumes the *legal* obligations of parenthood without going through the legal formalities of adoption. 59 Am. Jr. 2d § 88 and the cases cited therein. A legal guardian stands *in loco parentis*. 39 Am. Jr. 2d § 65 and the cases cited. For all intents and purposes, the legal guardian becomes the child's parent.

That is exactly what I think is happening here. Too many courts and judges feel that they know how to run other people's business better than they do. I frankly admit my ignorance as to how high school athletics should be operated and the problems involved therein. As long as a rule, law or regulation appears to make a reasonable classification to obtain a lawful objective or result it should not be struck down. Here the objective of the rule that does not permit a student to jump from one school to the other and participant in competitive athletics without his parents moving with him is meritorious and appears to me to be reasonable and does not involve a "suspect classification." This, latter term is nothing more than a method used to put the burden of proof on another party. To me the "suspect classification" occurs when a student moves to another school to participate in competitive athletics without his parents moving with him. That is exactly the situation here. The evidence shows without dispute that the student's brother wrote a letter in which he said:

". . . If they would have told me this rule before he (Plaintiff) started school I could have sent him home where he could have played with any difficulties what so ever. I could have send money home every month to help my parent out." (sic)

This evidence shows that the controlling factor in his move was participation in athletics where he went to school. For the reasons stated, I would affirm the trial court. The facts support it.

NOTE.—Reported in 305 N. E. 2d 877.