INDIANA HIGH SCHOOL ATHLETIC ASSOCIATION AND RUSHVILLE CONSOLIDATED SCHOOL CORPORATION *v.* JERRY W. RAIKE, BY HIS NEXT FRIEND AUDREY J. MINNEMAN.

[No. 2-273A38. Filed May 12, 1975.]

*Highes & Young,* of Rushville, *Adams & Cramer,* of Shelby-ville, for appellant.

*Robert C. Hagemier,* of Indianapolis, *Robert F. Lehman,* of Indianapolis, for appellee.

## CASE SUMMARY

BUCHANAN, J.—This is an appeal by Defendants-Appellants, Indiana High School Athletic Association (IHSAA) and Rushville Consolidated School Corporation (Rushville) from a declaratory judgment and permanent injunction prohibiting the Appellants from denying Plaintiff-Appellee Jerry W. Raike (Raike), a married high school student, from participating in Rushville's athletic and extra-curricular program, the Appellants claiming: (1) constitutionality of IHSAA's and Rushville's rules prohibiting married students from participating in athletics as violative of the equal protection clause of the U. S. and Indiana Constitutions; (2) improper joinder; (3) improper granting of a preliminary injunction; (4) failure of Raike to exhaust administrative remedies; (5) improper form of the declaratory judgment; and (6) "unclean hands".

We affirm.

## FACTS

The essential facts most favorable to the trial court's judgment are:

On November 27, 1971, Raike was a senior in good standing enrolled in the Rushville High School in Rushville, Indiana. On that date, Raike, being seventeen years of age, married a sixteen-year-old Rush County female and approximately two weeks later, a child was born to Mrs. Raike. The trial court specifically found that this marriage "conformed exactly to the statutory mandate of Burns Ind. Stat. Ann. § 44-101 (IC 1971, 31-1-1-1)" [now 31-1-1-1, *et seq.* (Burns Supp. 1974)].

Prior to this marital union Raike actively participated in Rushville's athletic program, including football, wrestling and baseball.

Being aware of certain rules adopted by IHSAA and Rushville prohibiting married students from participating in athletics, Raike sought unsuccessfully prior to his marriage to avoid operation of these rules.

He then filed, on December 16, 1971, a complaint against Rushville and IHSAA seeking a Declaratory Judgment and a Temporary Restraining Order (with Affidavits). The Temporary Restraining Order was granted the same day *(ex parte)* and on September 21, 1972, the Superior Court of Marion County, Room No. 6, made findings of fact and conclusions of law and entered a Declaratory Judgment and Permanent Injunction against IHSAA and Rushville enjoining them from enforcing their restrictive rules prohibiting married high school students from engaging in athletic competition and extra-curricular activities. In granting injunctive relief the trial court specifically found that the rules in question violated equal protection of the laws guaranteed Raike under the Fourteenth Amendment to the Constitution of the United States and that the same rules were also violative of due process of law as guaranteed Raike by the Fourteenth Amendment of the Constitution of the United States.

The parties have stipulated that enforcement of the rules in question constitutes State action.

Six issues are presented by this appeal and additional and supplemental facts will be supplied as each issue is considered.

## ISSUE ONE

Do the Rules of Rushville and IHSAA prohibiting married high school students from participating in athletics and extra-curricular activities deny Raike equal protection of the laws as guaranteed by the Fourteenth Amendment of the U. S. Constitution?

## ADDITIONAL FACTS

Raike attacks these rules as being discriminatory:

*The Rushville Rule:*

"Married students, or those who have been married, are in school chiefly to meet academic needs and they will be disqualified from participating in extra-curricular activities and Senior activities except Commencement and Baccalaureate."

*The IHSAA Rule:*

"Students who are or have been at any time married are not eligible for participating in intraschool athletic competition." (Rule 14 of its By-laws)
(Collectively referred to as the Rules)

The trial court found that Rushville was subject to the rules and regulations of IHSAA and evidence was introduced showing IHSAA's avowed purpose to be:

*"The purpose of this Association shall be to encourage and direct wholesome amateur athletics in the schools of Indiana.* In keeping with this purpose the Association shall regulate, supervise, and administer interscholastic athletic activities among its member schools. *All such activities shall remain an integral factor in the total secondary educational program."* (As emphasized in *Haas* v. *South Bend Community School Corp., infra.)* Article Two of the Constitution of IHSAA.

Also, there was evidence that IHSAA was originally organized in 1903 in an attempt to establish and maintain uniformity of rules and regulations in athletic events.

High school principals, teachers, coaches and consultants testified to the reasons[1] justifying the existence of the Rules. Their testimony may be summarized as follows:

1. Married students need time to discharge economic and family responsibilities, and participating in athletics and extra-curricular activities would interfere with these responsibilities;

2. Teenage marriages should be discouraged so as to reduce the high percentage of divorce and school dropout rates among married students;

3. Athletes serve as models or heroes to other students and teenage marriages are usually the result of pregnancy

---

1. No argument was made either by IHSAA or Rushville that the Rules had only a minimal impact as less than one per cent of high school students marry, and further, married students are able to avoid IHSAA's rule against transfers because their residence would no longer be determined by their parents and they could therefore engage in "school shopping" by moving from one school district to another at will.

Even if properly argued, these reasons in justification of the Rules would not change our decision.

so that immorality is encouraged if married students participate without sanction in athletics.

4.  If married students participate in athletics, a double standard must be applied, thereby causing discipline, training and administrative problems.

5.  Unwholesome interaction between married and non-married students is prevented by avoidance of undesirable "locker room talk".

After Raike was permitted to participate in athletics as a married person, his athletic and academic career showed marked improvement. He won the sectional wrestling championship and was elected captain of the wrestling team. Similarly, in baseball Raike's batting average improved by almost 100 points from the prior year and the baseball team's record improved from the prior year.

Raike was able to maintain a B average, hold down a part-time job, engage in athletics and at the same time discharge his family responsibilities.

## CONTENTIONS OF THE PARTIES

Rushville and IHSAA assert that, under the two-tier standard of review for equal protection issues, there is neither a fundamental right nor suspect criteria presented which require "strict judicial scrutiny". The constitutionality of the Rules is supported by a rational basis and justified by the evidence under the low scrutiny standard of review.

Raike claims the Rules impair and infringe upon the fundamental right to marry and that no compelling state interest is satisfied under the strict scrutiny test. Secondly, these Rules fail to satisfy even the rational basis standard and this contention is fully supported by the evidence.

## DECISION

CONCLUSION—It is our opinion that the Rules prohibiting a married high school student from participating in athletics

and extra-curricular activities do not bear a fair and substantial relation to the objective sought, and therefore deny Raike equal protection of the laws contrary to the Fourteenth Amendment of the U. S. Constitution.[2]

PREFACE

IHSAA's rules limiting the right of high school students to participate in athletics have not fared well in Indiana. In 1972 the Indiana Supreme Court decided *Haas* v. *South Bend Community School Corp.* (1972), 259 Ind. 515, 289 N.E.2d 495, nullifying a rule prohibiting female students from competing in male non-contact sports (golf). Two years later in *Sturrup* v. *Mahan* (1974), 261 Ind. 463, 305 N.E.2d 877, the same court considered and found "ineligible" for constitutional purposes an IHSAA rule which declared a high school student ineligible to participate in athletics if he or she transferred from one school district to another unless the student's parents actually changed their residence to the new school district. Violation of the equal protection clause of the Fourteenth Amendment prohibiting a state from denying "to any person within its jurisdiction the equal protection of the laws" was the basis for these decisions. Now we consider[3] an IHSAA rule which denies par-

---

2. When the equal protection clause of the Fourteenth Amendment of the U. S. Constitution has been violated, "it necessarily follows that Art. 1, § 23 of the Constitution of the State of Indiana" has also been violated. "It is well established that the rights intended to be protected under both constitutional provisions are identical." *Haas* v. *South Bend Community School Corp.* (1972), 259 Ind. 515, 526, 289 N.E.2d 495, 501. *See State ex rel. Miller* v. *McDonald* (1973), 260 Ind. 565, 568, 297 N.E.2d 826, 829.

3. Although the issue of Raike's eligibility to participate in Rushville's athletic and extra-curricular activities program might be considered to have been rendered technically moot by his graduation in 1972, the issue is one of substantial public interest and the issue should be decided on its merits. *State ex rel. Smitherman* v. *Davis* (1958), 238 Ind. 563, 568, 151 N.E.2d 495; *Indianapolis* v. *Indiana St. Bd. of Tax Comm'rs* (1973), Ind. App., 294 N.E.2d 136, 139-140 (transfer granted, appeal dismissed at 261 Ind. 635, 308 N.E.2d 868); *Dittmer* v. *Indianapolis* (1968), 143 Ind. App. 621, 625, 242 N.E.2d 106; *Bd. of Dir. of Ind. School Dist. of Waterloo* v. *Green* (1967), 259 Iowa 1260, 147 N.W.2d 854, 856; *Sturrup* v. *Mahan* (1974), 261 Ind. 463, 305 N.E.2d 877. Also the Rules constitute "state action" for the purpose of allowing

ticipation in athletics to a student who is or has been married —a classification based on marriage.

In reviewing a classification for equal protection impurity, classic constitutional methodology requires us to determine the appropriate standard of review to be used. That choice determines how closely the justification for the classification will be scrutinized.

## I. STANDARDS OF REVIEW

A two-tier approach has been developed by the United States Supreme Court in evaluating and reviewing equal protection cases. *Frontiero* v. *Richardson* (1973), 411 U.S. 677; *Weber* v. *Aetna Casualty & Surety Co.* (1972), 406 U.S. 164; *Schilb* v. *Kuebel* (1971), 404 U.S. 357; *Green* v. *Waterford Bd. of Educ.* (2d Cir. 1973), 473 F.2d 629, 632; *Gilpin* v. *Kansas St. High School Activities Ass'n, Inc.* (D. Kan. 1974), 377 F.Supp. 1233, 1238; *Norton* v. *Weinberger* (D. Md. 1973), 364 F.Supp. 1117, 1121; *Sumpter* v. *State* (1974), 261 Ind. 471, 477, 306 N.E.2d 95, 100; Stroud, *Sex Discrimination in High School Athletics* (1973), 6 IND. L. REV. 661, 673. The "low" tier or low scrutiny test presumes constitutionality of the classification and will not disturb the state action unless the classification bears no "rational relationship" to a legitimate governmental interest . . . a minimal test. If it bears some rational relationship to a legitimate government purpose, the classification can withstand equal protection scrutiny, even though there be significant deviation from an ideal classification. *Frontiero* v. *Richardson, supra; Dandridge* v. *Williams* (1970), 397 U.S. 471; *McGowan* v. *Maryland* (1961), 366 U.S. 420; *Gilpin* v. *Kansas St. High School Activities Ass'n, Inc., supra;* Stroud, *Sex Discrimination in High School Athletics, supra.*

At the other end of the scale of judicial review of chal-

reviewability under the Fourteenth Amendment. *See Sturrup* v. *Mahan, supra; Haas* v. *South Bend Community School Corp., supra; Wellsand* v. *Valparaiso Community School Corp.,* No. 71 H 122(2) (unpublished opinion) (N.D. Ind.), Sept. 1, 1971; *Louisiana High School Ath. Ass'n* v. *St. Augustine High School,* 396 F.2d 224 (5th Cir. 1968). *See also Tinker* v. *Des Moines School Community Dist.,* 393 U.S. 503 (1969).

lenged classifications is the second tier approach or high scrutiny test. If the classifying criteria are grounded upon certain "suspect traits", such as race,[4] alienage[5] or national origin,[6] or if that classification impinges upon rights deemed "fundamental", e.g., the right to vote,[7] interstate travel,[8] the right to appeal a criminal conviction,[9] freedom of association,[10] then "strict" judicial scrutiny will be brought to bear on the classification and it will not stand unless justified by a compelling governmental interest.[11] *See, Frontiero v. Richardson, supra; Brown v. State* (1975), 262 Ind. 629, 322 N.E.2d 708; *Sumpter v. State, supra; Stroud, Sex Discrimination in High School Athletics, supra.*

The rigidity of the two-tier test inevitably led to a blurring of this somewhat artificial dualism. In recent years various

4. *See Loving v. Virginia,* 388 U.S. 1, 11 (1967); *McLaughlin v. Florida,* 379 U.S. 184, 191-192 (1964).

5. *See Graham v. Richardson,* 403 U.S. 365, 372 (1971).

6. *See Oyama v. California,* 332 U.S. 633, 644-646 (1948); *Korematsu v. U.S.,* 323 U.S. 214, 214-216 (1944). Sex is not included as a "suspect classification" because to date there has been no such holding by a majority of the United States Supreme Court. (Plurality opinion.) *Sumpter v. State* (1974), 261 Ind. 471, 306 N.E.2d 95. *See Frontiero v. Richardson, supra. See generally The Supreme Court, 1973 Term,* 88 *Harv. L. Rev.* 43, 129-139 (1974).

7. *See Dunn v. Blumstein,* 405 U.S. 330, 336-337 (1972); *Kramer v. Union Free School Dist.,* 395 U.S. 621 (1969).

8. *See Shapiro v. Thompson,* 394 U.S. 618, 629-630 (1969); *United States v. Guest,* 383 U.S. 745 (1966).

9. *See Griffin v. Illinois,* 351 U.S. 12 (1956).

10. *See Village of Belle Terre v. Boraas,* 416 U.S. 1 (1974); *Griswold v. Connecticut,* 381 U.S. 479, 482-483 (1964); *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 460 (1957).

11. It has been stated that when strict judicial scrutiny is required, the reviewing court may employ other procedural corrollaries to determine the classification's constitutionality:
"First, the burden of showing the validity of the statute is placed on the state. Second, a court will not merely assume any reasonably conceivable legitimate governmental purpose but will determine for itself the legitimacy of the probable 'real' purpose. Third, a court will balance the state interest or purpose against the individual interest at stake and determine whether the state has a 'compelling' interest such that the individual interest must be subordinated to it. Fourth, a court will not merely assume as true any facts reasonably conceivable which justify the classification but will require the state to prove such facts. Fifth, a court has a minimal tolerance for under-inclusion or over-inclusion in the classification."
Stroud, *Sex Discrimination in High School Athletics,* 6 Ind. L. Rev. 661, 665 (1973).

courts and commentators have sensed modification of the two-tier approach. They point to a "new" or hybrid approach to equal protection which is more flexible. By its terms, the classification must be justified by something more than any "reasonably conceivable" set of facts. Rather it:

> "must rest upon ground of difference having a *fair and substantial relation to the object* of the legislation, so that all persons similarly circumstanced shall be treated alike." (Emphasis supplied.) *Village of Belle Terre* v. *Boraas* (1974), 416 U.S. 1.

*See also,*

> *Johnson* v. *Robinson* (1974), 415 U.S. 361; *Eisenstadt* v. *Baird* (1972), 405 U.S. 438; *Reed* v. *Reed* (1971), 404 U.S. 71; *Haas* v. *South Bend Community School Corp., supra;* Stroud, *Sex Discrimination in High School Athletics, supra; The Supreme Court, 1973 Term* (1974), 88 HARV. L. REV. 41, 101, 124.

This "new" or intermediate approach has been interpreted as being based upon a "multi-factor, sliding scale" analysis with the two end points of the scale being the traditional two tiers of high and low scrutiny. *See, Eslinger* v. *Thomas* (4th Cir. 1973), 476 F.2d 225; *Wark* v. *Robbins* (1st Cir. 1972), 458 F.2d 1295; Gunther, *The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 HARV. L. REV. 1 (1972), (hereinafter referred to as "Gunther").

It has also been viewed as a general shift from a slightly altered rational basis standard to a "slightly, but perceptively more rigorous" standard. *Green* v. *Waterford Bd. of Educ., supra; Norton* v. *Weinberger, supra* at 1122; *Aiello* v. *Hansen* (N.D. Cal. 1973), 359 F.Supp. 792, 796.

*See also,*

> *San Antonio Ind. School Dist.* v. *Rodriguez* (1973), 411 U.S. 1, 98-104, 109 (Justice Marshall, dissenting); Gunther, *supra; The Supreme Court, 1973 Term, supra; Gilpin* v. *Kansas St. High School Activities Ass'n, Inc., supra.*

In summary, then, under the traditional two-tier approach of the United States Supreme Court, the classification was

initially examined to determine if it was "suspect" or if a "fundamental right" was violated by the statutory or regulatory scheme; if not, the low scrutiny, rational basis test for review was used. Judicial review of classifications will be more flexible if the "new" or intermediate approach is followed by the reviewing court. The general principle seems to be that the more important and closer the individual's interest comes to a specific constitutional guarantee, the greater the degree of judicial scrutiny. The importance of the standard of review adopted is that the result reached is in large part a product of that initial decision.

## A. "HIGH" TIER (STRICT JUDICIAL SCRUTINY)

With this background as to the standards of judicial review available for examination of classifications questioned as violative of the equal protection clause, it is meet that we now inspect the classification before us.

Obviously a "suspect" classification is not involved (is not based on race, alienage or national origin). Not so obvious, however, is whether the Rules impinge upon a "fundamental right".

In determining a fundamental right,

"judges are not left at large to decide cases in light of their personal and private notions. Rather, they must look to the 'traditional and [collective] conscience of our people' to determine whether a principle is 'so rooted [there] . . . as to be ranked as fundamental.' Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674." *Griswold* v. *Connecticut, supra,* at 493 (Justice Goldberg, concurring opinion).

It has been previously decided for us by *Haas* v. *South Bend Community School Corp., supra,* that high school students do not have an absolute and fundamental right to participate in high school athletics and extra-curricular activities. The right to an education is not a guaranteed right under the Federal Constitution [*San Antonio Ind. School Dist.* v. *Rodriguez, supra*].[12]

---

12. However, these are important interests and are to be encouraged. *San Antonio, supra,* 411 U.S. at 30. *Accord Haas, supra,* 289 N.E.2d at

But clouds of uncertainty surround the question of whether a married high school student can be denied the participation in athletics and extra-curricular activities solely because of marital status. *Cf. Gilpin, supra* (1974), 377 F.Supp., at 1241.

There is little doubt that the Rules affect Raike's right to marry. Regardless of his age or other circumstances he no longer can participate in athletics if he marries. Has a fundamental right in the sense contemplated by the high scrutiny test been violated?

Concerning the institution of marriage, it has been said:

"Freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment. Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010; Griswold v. Connecticut, supra; Pierce v. Society of Sisters, supra [268 U.S. 510]; Meyer v. Nebraska, supra [262 U.S. 390]. See also Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed.2d 645; Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655." *Roe v. Wade* (1973), 410 U.S. 113, 169 (Justice Stewart, concurring).

Freedom to marry has also been described as "one of the vital personal rights essential to the orderly pursuit of happiness by free men" [*Loving, supra,* (1967), 388 U.S. at 12], and is therefore "fundamental to our very existence and survival" [*Loving, supra,* 338 U.S. at 12; *Skinner v. Oklahoma* (1942), 316 U.S. 535, 541].

In *Griswold v. Connecticut,* the right to marital privacy was described as

"lying within the zone of privacy created by several fundamental constitutional guarantees . . . . [Marriage] is an association for as noble a purpose as any involved in our prior decisions." 381 U.S. 479, 485-486 (1964).

Justice Goldberg in his concurring opinion in *Griswold*

499-500; *Brenden v. Independent School Dist. #742,* 477 F.2d 1292, 1298-1299 (8th Cir. 1973); *Gilpin v. Kansas St. High School Activities Ass'n, Inc., supra,* 377 F.Supp. at 1240-1241; *Davis v. Meeks,* 344 F.Supp. 298, 301 (N.D. Ohio 1972); *Moran v. School Dist. #7, Yellowstone County,* 350 F.Supp. 1180, 1184 (D. Mont. 1972); Goldstein, *The Scope and Source of School Board Authority to Regulate Students' Conduct,* 117 U. PA. L. REV. 373, 397 (1969).

found the right to marry a right similar in magnitude to "the fundamental rights specifically protected":

> "The entire fabric of the Constitution and the purposes that clearly underlie its specific guarantees demonstrate that the rights to marital privacy and to marry and raise a family are of similar order and magnitude as the fundamental rights specifically protected.
>
> "Although the Constitution does not speak in so many words the right of privacy in marriage, I cannot believe that it offers these fundamental rights no protection. The fact that no particular provision of the Constitution explicitly forbids the state from disrupting the traditional relation of the family—a relation as old and as fundamental as our entire civilization—surely does not show that the government was meant to have the power to do so. Rather . . . there are fundamental personal rights such as this one, which are protected from the abridgement by the government though not specifically mentioned in the Constitution." *Griswold, supra,* 381 U.S. at 495-496 (1964). (Justice Goldberg, concurring opinion)

Other descriptions of the rights emanating from marriage have been phrased in terms of being within the "penumbra" of the Bill of Rights [*see Griswold, supra,* 381 U.S. 479] or within the concept of "liberty" guaranteed by the first section of the Fourteenth Amendment [*see Meyer* v. *Nebraska,* 262 U.S. 390 (1923) ; *Roe* v. *Wade, supra,* 410 U.S. 113 (1973)], or being a "basic civil right of man" [*Loving, supra,* 388 U.S. at 12 (1967) ; *Skinner, supra,* 316 U.S. at 541 (1942)].

Yet there is no conclusive United States Supreme Court holding that the right to marry is a fundamental right. Nor is there any such holding by our Supreme Court.[13] Professor Stroud,[14] in commenting on *Wellsand* v. *Valparaiso Community School Corp.,* No. 71-A-122(2) (unreported) (N.D. Ind. 1971), (hereinafter discussed) refers to "the arguably fundamental right to marry". Our reading of recent United States Supreme Court cases indicates a shrinking rather than an

---

13. Marriage has been held in Indiana to be an "institution involving the highest interest of society . . . ." *Sweigart* v. *State* (1973), 213 Ind. 157, 165, 12 N.E.2d 134, 138 (involved a statute providing a penalty for solemnizing a marriage contrary to statutory command).

14. Stroud, *Sex Discrimination in High School Athletics, supra.*

expansion of the concepts of "suspect" classifications and fundamental rights. See Justice Powell's concurring opinions in *Frontiero* v. *Richardson, supra,* and *Sumpter* v. *State, supra.*

The beguiling language about the right to marry represents the opinion of individual Justices and not a holding of the United States Supreme Court.

Because the right to marry has not been conclusively recognized as a fundamental right, we may not apply the high scrutiny test as a standard of review of the Rules.

## B. INTERMEDIATE OR SLIDING SCALE SCRUTINY

While it is true high school students do not have a fundamental or absolute right to participate in interscholastic athletics, it is, nevertheless, a right that "should be encouraged as it provides students the opportunity to cultivate good habits and to develop their mental and physical abilities". *Haas* v. *South Bend Community School Corp., supra,* 259 Ind. at 524, 289 N.E.2d at 499-500.

High school students, with some limitations, also enjoy "the vital personal right(s)" of marriage (*Loving*), which is considered by some to rise to the level of a fundamental right.

A classification which prohibits participation in athletic competition solely because of the marital status of the high school student shackles two important rights, and thereby prompts us to adopt as a standard of review the intermediate scrutiny test. Our specific authority for this constitutional methodology is *Haas,* a case holding IHSAA's rule prohibiting females from engaging in interscholastic golf competition to be violative of the equal protection clause. Justice Hunter, speaking for the majority, cited and relied on *Reed* v. *Reed, supra.* To withstand constitutional challenge, then, the classification:

> " ' "must be reasonable . . . and must rest upon some ground of difference having a *fair and substantial relation to the object of the legislation,* so that all persons similarly circumstanced shall be treated alike." ' *Reed* v. *Reed,* (1971),

404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225, 229; Royster Guano Co. v. Virginia (1920), 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989." (Emphasis supplied.) *Haas*, 259 Ind. at 522, 289 N.E.2d at 498.

So our next task is to ascertain the objective of the Rules. If the classification created bears a fair and substantial relation to the objective treating all persons similarly situated alike, then the classification is not violative of equal protection.

Article Two of the Constitution of IHSAA declares that:

> "*The purpose* of this Association *shall be to encourage and direct wholesome amateur athletics* in the schools of Indiana. In keeping with this purpose the Association shall regulate, supervise and administer interscholastic athletic activities among its member schools." (Emphasis supplied.)

So the avowed purpose of IHSAA in promulgating its rules and regulations, including those in question,[15] is to regulate and supervise interscholastic high school athletics so as to create a wholesome atmosphere . . . an atmosphere free of corrupting influences. To this stated purpose must be added the testimony of IHSAA's experts and various high school officials. Throughout their testimony runs the same thread . . . the elimination of immoral or corrupting influences, and married students inject an immoral and corrupting influence into an otherwise wholesome atmosphere.

Other reasons are given in justification of the Rules, such as the desirability of eliminating premarital sex and teenage marriages with or without resulting pregnancies, and the reduction of high dropout rates and high divorce rates among married high school students. But such justification appears to be more an effect of the Rules than their ultimate objective.

Thus we arrive at the conclusion that the objective of the Rules is to preserve the integrity and wholesome atmosphere of amateur high school athletics by prohibiting married students from participating therein because they are bad examples and their participation interjects an unwholesome

---

15. Rushville is bound by its membership in IHSAA and therefore must strictly adhere to IHSAA's rules and regulations. *Haas* v. *South Bend Community School Corp., supra*, 259 Ind. at 519, 289 N.E.2d at 497.

influence. The unwholesome influence is said to result from discussion of marital intimacies and other corrupting "locker room talk", and further, from hero worship of married students (who may or may not have engaged in premarital sex with resultant pregnancy and forced marriage).

It is obvious that the classification used to attain the desired objective is one prohibiting *all* married high school students from participating in athletics solely on the basis of their present or previous married status; i.e., dissimilar treatment is afforded married and unmarried students . . . all in the name of preventing married students from exerting an unwholesome effect on high school athletics.

While the Rules as drawn may reasonably contribute in some measure to the realization of that goal, they are unreasonable in that the classification is not narrowly drawn—it is both over-[16] and under-inclusive.[17]

The classification is over-inclusive in that it includes some married students of good moral character who would not corrupt the morality of their fellow students or contribute to an unwholesome atmosphere.

It is under-inclusive in that it includes neither unmarried high school students who participate in athletics as team members, student managers or trainers, and yet may engage in premarital sex nor unmarried high school students who may be of a depraved nature, all of whom are as likely to be a corrupting influence as married high school students.

The classification simultaneously catches too many fish in the same net and allows others to escape.

---

16. An over-inclusive classification includes not only those who are similarly situated with respect to the purpose but also includes others who are not so situated. Stroud, *Sex Discrimination in High School Athletics, supra,* at 663-664; *Developments—Equal Protection, supra. See generally, Bd. of Educ.* v. *Bentley,* 383 S.W.2d 677, 679 (Ky. 1964).

17. An under-inclusive classification occurs when the state benefits or burdens persons in a manner that furthers a legitimate public purpose but does not confer this same benefit or place this same burden on others who are similarly situated. *Developments—Equal Protection, supra* at 1084. Stroud, *Sex Discrimination in High School Athletics, supra,* at 663-664; *See Sturrup* v. *Mahan, supra,* 261 Ind. at 466, 305 N.E.2d at 879.

In effect, those similarly situated are not similarly treated, and therefor there is no fair and substantial relation between the classification and the objective sought.

In the succinct words of *Reed,* "all persons similarly circumstanced shall be treated alike" . . . and they were not.

Insofar as the classification discourages teenage marriages resulting from pregnancies, it is also defective in that it contravenes established public policy allowing teenage high school students of Raike's age to legitimate offspring resulting from premarital sex.[18]

The court in *Romans* v. *Crenshaw,* 354 F.Supp. 668 (S.D. Tex. 1972) put it this way:

"A rule that would punish the necessary legitimation of an offspring [by getting married] *would* in its purblind application *effectively reward the bastardizing of the offspring* [if marriage was not consummated]." (Emphasis supplied.) 354 F.Supp. at 870.

## C. "LOW" TIER (LOW SCRUTINY)

It is possible to apply the low scrutiny test to the Rules and conclude that there is no rational basis whatsoever to support such a classification. Judge Eschbach, in *Wellsand* v. *Valparaiso Community School Corp., supra,* No. 71 H 122(2) (Unpublished opinion) (N.D. Ind. 1971), after examining each of IHSAA's six reasons justifying the same "marriage rule" now before us, concluded that it was constitutionally defective as a violation of equal protection because there was no "rational basis for the classification of students into different groups and a different treatment accorded each group" (citing *McGowan* v. *Maryland,* 366 U.S. 420 (1961) and *Kramer* v. *Union Free School District No. 15,* 395 U.S. 621 (1961)). There are other cases that have reached a similar conclusion: *Moran* v. *School Dist. #7,* 350 F.Supp. 1180 (D. Montana 1972). *Hollon* v. *Mathis Ind. School Dist.,* 358 F. Supp. 1269 (S.D. Tex. 1973); *Romans* v. *Crenshaw,* 354 F.Supp. 868 (S.D. Tex. 1972).

18. IC 1971, 31-1-1-1, *et seq.,* Ind. Ann. Stat. § 44-101 *et seq.* (Burns Supp. 1974).

*See also,*

   *Holt* v. *Shelton,* 341 F.Supp. 823 (M.D. Tenn. 1972).

We prefer to rest our decision on the reasoning of *Haas, Sturrup,* and *Reed,* recognizing that such reliance does not necessarily eliminate the possibility that there may be *some* rational basis or rational connection between a classification and the object sought to be obtained.[19]

## II. THE "MARRIAGE" RULES VIEWED BY OTHER JURISDICTIONS

No Indiana court has considered the so-called "Marriage" rules prohibiting married students from participating in athletics and extra-curricular activities. Other jurisdictions have treated the constitutionality of similar rules. We find the cases are divided as to: the result, the basis for the decision, and the date of the decision.

Prior to 1970 (the transitional period), courts appeared reluctant to intervene in disputes involving the propriety of regulations prohibiting married students from participating in extra-curricular activities:

> "It is not for the courts to be concerned with the wisdom or propriety of a school board resolution prohibiting married students from participating in extra-curricular school activities, as to its social desirability, nor whether it best serves the objectives of education, nor the application to the plaintiff in his particular circumstances. So long as the resolution is deemed by the Board of Education to serve the purpose of best promoting the objectives of a school, and the standards of eligibility are based upon uniformly applied classification which bear some reasonable relationship to the objectives, it cannot be said to be capricious, arbitrary, or unjustly discriminatory." *Starkey* v. *Board of Education,* 14 Utah2d 227, 381 P.2d 718, 720 (1963).

---

19.   Professor Stroud hypothecated about *Reed:*
"The court could have reasonably conceived that due to a difference in education and experience, males were most often appointed after a fair hearing on the merits [as opposed to females] and therefore the legislative classification by sex was reasonable because it was a fairly reliable predictor of the competence to be an administrator."
Stroud, *Sex Discrimination in High School Athletics, supra,* at p. 671.

On the basis of some "reasonable relationship," courts did uphold the reasonableness and constitutionality of such rules.

*See,*

*Starkey* v. *Board of Education, supra; Estay* v. *LaFourche Parish Bd.* (1969), La.App., 230 So.2d 443; *State* v. *Stevenson* (Ohio Com. Pl. 1962), 27 Ohio Op. 2d 223, 189 N.E.2d 181; *Kissick* v. *Garland Independent School Dist.* (1969), Tex. Civ. App., 330 S.W.2d 708; *Cochrane* v. *Bd. of Education* (1960), 360 Mich. 390, 103 N.W.2d 569; *Bd. of Dir. of Ind. School Dist. of Waterloo* v. *Green, supra;* 11 A.L.R.3d 996.

Subsequent to 1970, these decisions appear not to have been followed or have been overruled. See *Davis, supra,* 344 F.Supp. 298. *See also, Moran, supra,* 350 F.Supp. 1180; *Romans, supra,* 354 F.Supp. 868; *Hollon* v. *Mathis Ind. School Dist., supra; Holt* v. *Shelton,* 341 F.Supp. 821 (M.D. Tenn. 1972); *Bell* v. *Lone Oak Ind. School Dist.,* Tex. Civ. App., 507 S.W.2d 636 (1974); 11 A.L.R.3d 996 (1974 Supp.)

The recent trend does support our conclusion of unconstitutionality, and in our opinion, expresses "the more acceptable view at this time" and implies that courts are "beginning to develop the conception that school children are the intended beneficiaries of public education . . . not its prisoners or servants." 3 *Journal of Law and Education* 93, 97 (1974).

*See generally, Goss* v. *Lopez,* 419 U.S. 565 (1975); *Wood* v. *Strickland,* 420 U.S. 308, 326 (1975); *Hollon, supra* at 1270.

## III.  HOLDING

For the reasons stated the Rules are a constitutionally impermissible classification denying Raike equal protection of the laws by excluding him from athletic and other extracurricular activities *solely* because of his marital status. Insulating athletic competition from the baleful influence of high school students who may or may not have married in haste will not pass constitutional muster, because there is no fair and substantial relationship between such a prohibition and

the desired objective of wholesomeness in interscholastic competition.

## ISSUE TWO

Were IHSAA and Rushville properly joined as defendants; and was venue properly in Marion County?

Rushville complains that Raike joined IHSAA as a party merely as a ruse to get venue in Marion County and that there is no relationship between its Rule and IHSAA's Rule . . . thus, improper joinder and venue resulted.

Raike says such joinder was not only permissive but necessary pursuant to Trial Rule 19(A), Trial Rule 20(A), and Trial Rule 75(A)(4).

### ADDITIONAL FACTS

It is uncontroverted that the principal office of IHSAA is located in Marion County, Indiana, and that the parties entered into a Stipulation at the time of the hearing on the permanent injunction on April 17, 1972, which provided:

"That by reason of the aforestated Rules and/or Regulations of each of the Defendants herein, Jerry W. Raike has been denied and will continue to be denied participation in the athletic and extra-curricular school activities . . . ."

### DECISION

CONCLUSION—It is our opinion that both the joinder of IHSAA as a party and the venue were proper.

IHSAA was properly a party to this action, either permissively under Trial Rule 20(A)(2) or as a necessary party under Trial Rule 19(A).

Trial Rule 20(A)(2) allows all persons to be joined as defendants:

". . . if there is asserted against them . . . any right to relief in respect of, or arising out of, the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action."

As Raike's brief aptly puts it, "In this case the occurrence was the marriage of the appellee [Raike] and the subsequent sanctions applied against the appellee by both appellants". And there is a question of law common to both defendants here. Application of the two rules produces substantially the same effect; and the question of law is their constitutionality.

Beyond permissive joinder Raike maintains that IHSAA is a necessary party because complete relief could not be afforded Raike without IHSAA as required by Trial Rule 19(A).[20] A meritorious argument indeed . . . otherwise, Raike as plaintiff could succeed in his action and be prohibited from enjoying the fruits thereof by IHSAA's rule.

IHSAA itself acknowledged the necessity of its presence as a party defendant by entering into the Stipulation providing that Raike would be denied participation in athletics by the operation of the two rules.

While the venue thus obtained (Marion County) may not have been to Rushville's liking, it could be considered preferred venue within the meaning of Trial Rule 75(A)(4)[21] . . . as one of the two defendants had its principal office in Marion County.

ISSUE THREE

> Were IHSAA and Rushville afforded proper notice and hearing of the issuance of the Preliminary Injunction on December 21, 1971?

They contend that notice received one day before the hearing for a Preliminary Injunction was improper and not in accordance with Trial Rule 6(D), but even if notice was proper they received no hearing.

---

20. Trial Rule 19(A) provides: "A person who is subject to service of process *shall be joined* as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, . . ." (Emphasis added.)

21. Trial Rule 75(A)(4): "(A) Venue. . . . *Preferred venue lies in* . . . (4) *the county where either the principal office of a defendant* organization is located or the office or agency of a defendant organization or individual to which the claim relates or out of which the claim arose is located, if one or more such organizations or individuals are included as defendants in the complaint; . . ." (Emphasis added.)

Raike asserts that the notice given and opportunity for hearing were proper and complied with Trial Rule 65 (A) (1) and (B) (2).

## ADDITIONAL FACTS

On December 16, 1971, the trial court entered a temporary restraining order, *ex parte,* and set a hearing on the "Restraining Order" for 9:00 a.m., Tuesday, December 21, 1971. Notice of this hearing, dated December 16, was served on both Rushville and IHSAA on December 20, one day prior to the hearing. On the day of the hearing, December 21, IHSAA appeared by counsel, but Rushville did not appear. Neither party sought a continuance or filed a motion to dissolve the temporary injunction and the trial court granted Raike a preliminary injunction based upon his Affidavit, and the trial court further granted a motion for change of judge filed by IHSAA at that time.

## DECISION

CONCLUSION—We are of the opinion that IHSAA and Rushville may not now raise alleged defects in the notice and hearing of the temporary injunction because of their failure to appeal from the granting of this interlocutory order.

No consideration need be given to the adequacy of the notice and hearing on the preliminary injunction. IHSAA and Rushville failed to appeal the granting of the temporary injunction, which is an interlocutory order, appealable to this court as one:

"Granting, or refusing to grant, or dissolving or overruling motions to dissolve preliminary injunctions; . . ." AP. 4 (B) (3).

The rule is firmly imbedded in Indiana appellate procedure that if an appeal is specifically authorized from an interlocutory order, then that order may not be questioned in an appeal from the final judgment ultimately rendered in the cause.

*Merrifield* v. *Williams* (1943), 221 Ind. 619, 51 N.E.2d 9, expressed the rule this way:

"Section 2-3218, Burns' 1933, § 490, Baldwin's 1934, specifically authorized appeals from interlocutory orders for the delivery of the possession of real estate and from the granting of temporary injunctions. The appellant prosecuted no such appeal and he may not now question the propriety of the interlocutory order, about which we express no opinion." 51 N.E.2d at 10.

More recently, Justice Arterburn in *Whitlock* v. *Public Service Co.*[22] (1959), 239 Ind. 680, 159 N.E.2d 280, relied on *Merrifield* v. *Williams, supra,* and other Indiana cases, saying:

"We have made an independent search and find that in an analogous situation, *where there is a failure to appeal from interlocutory orders in the granting of injunctions,* this court has held upon an appeal from the final judgment in such actions it will not review claimed errors with reference to the prior interlocutory orders from which an appeal could previously have been taken. Detamore v. Roberts, 1944, 223 Ind. 12, 14, 57 N.E.2d 585; Merrifield v. Williams, 1943, 221 Ind. 619, 622-623, 51 N.E.2d 9; Price v. Bayless, 1892, 131 Ind. 437, 438, 31 N.E. 88; Becknell et. al. v. Becknell, 1887, 110 Ind. 42, 53-54, 10 N.E. 414." (Emphasis supplied.) 239 Ind. at 685-686, 159 N.E.2d at 283.

In 1973, the principle of waiver by failure to appeal from an interlocutory order[23] was reaffirmed by the Indiana Supreme Court in *State* v. *Robertson* (1973), 260 Ind. 174, 179, 293 N.E.2d 775, 778:

"Instead of appealing the order immediately, the State chose instead to file an amended complaint. In making this choice, and in failing to immediately appeal from the order, the State *has waived any claimed error in making such order.* Whitlock v. Public Service Co. of Indiana, Inc. (1959), 239 Ind. 680, 159 N.E.2d 280; Thiesing Veneer Co. of Ind. v. State (1970), 254 Ind. 699, 262 N.E.2d 382." (Emphasis supplied.)

It has also been held that a litigant with full knowledge of possible erroneous or harmful action who fails to take

22. Compare *Buchanan* v. *Berkshire Life Insurance Co.* (1884), 96 Ind. 510; *Hay* v. *McDaneld* (1901), 156 Ind. 390, 59 N.E. 1064.
23. For collection of cases on this point, see 79 A.L.R.2d 1352.

 

steps to correct it is estopped from later asserting it, *Umbstead* v. *Preachers Aid Society* (1945), 223 Ind. 96, 58 N.E.2d 441.

Tempus fugit.

## ISSUE FOUR

Did Raike fail to exhaust his administrative remedies?

Rushville asserts that Raike failed to exhaust his administrative remedies by not appearing before the Board of School Trustees to give reasons why he should be allowed to participate in any extra-curricular activities, in compliance with the provisions of the Administrative Adjudication Act, Burns Indiana Statutes, 1961 Repl., Section 3001, *et seq.*, IC 1971, 4-22-1-1, *et seq.*

Raike responds that the evidence shows repeated communications to the Rushville Principal and School Superintendent (Huddleston) requesting that the Marriage Rule be changed.

## ADDITIONAL FACTS

Prior to filing this Injunction action on December 16, 1971, Raike and his attorney exchanged correspondence with Eugene Huddleston, Principal of Rushville High School and Rushville Superintendent of Schools.

After a conference with Huddleston, Raike wrote a letter at Huddleston's suggestion, dated November 18, 1971, asking him to try to get the current policy changed so that Raike could participate in the school's extra-curricular activities, whether married or not. On November 16, Raike's attorney had written Huddleston asking that the school board waive their policy concerning married students.

Then on November 18, 1971, Huddleston wrote Raike as follows:

"Dear Mr. Raike:

"Your written request for me to try to get the current policy, concerning married students changed has been received.

"The policy on married students was reviewed by the Board of Education on October 11, 1971, and the Board

voted to leave the policy the same as printed in the school board handbook. Since the policy was reviewed only recently, I will exert no further effort to have the policy changed.

"Sincerely,

/s/Eugene Huddleston

Superintendent of Schools . . . Letter mailed to 127 W. Second St.—Rushville, c/o Mr. John O. Worth, Attorney."

Thereafter, neither Raike nor his attorney made any further request to appear before the school board nor was any legal action filed in the Rushville Circuit Court prior to the filing of the present Injunction action. The school board handbook referred to in Huddleston's letter provided no explicit procedure for a student to follow in seeking to change or eliminate a school board rule.

## DECISION

CONCLUSION—We are of the opinion that Raike did exhaust the administrative remedies available to him.

Rushville points to no specific provisions of either the Administrative Adjudication Act or the IHSAA "School Board Policy Handbook" to support its position that Raike failed to pursue administrative remedies prior to seeking an Injunction.

Instead Rushville quotes extensively from *Bouse* v. *Hipes* (1970), 319 F.Supp. 515 (S.D. Ind.), to the effect that the Administrative Adjudication Act applies to school boards as agencies of the State and that a student must exhaust his administrative remedies with the school board before commencing legal action. [*But see Tippecanoe Valley School Corp.* v. *Leachman* (1970), 147 Ind. App. 443, 452, 261 N.E.2d 880.] So no hearing having been sought, no legal action could be taken.

Assuming without deciding that a hearing should have been sought under the Administrative Adjudication Act,[24] pursuit

---

24. Subsequent Indiana law seems to be more specific in this area of student discipline. *See* IC 1971, 20-8.1-5-1, *et seq.*, Ind. Ann. Stat. § 28-5390, *et seq.* (Burns Supp. 1974), effective July 26, 1973.

thereof by Raike would have been useless in view of Huddleston's letter of November 18, stating that:

"The policy on married students was reviewed by the Board of Education on October 11, 1971, and the Board voted to leave the policy the same as printed in the school board handbook."

Thus, Raike was led to believe that Huddleston had communicated with the board and was aware of his case and would not change the marriage rule.

A recognized exception to the rule of exhaustion of remedies aids Raike:

*"Exceptions to Rule.* The rule that administrative remedies must be exhausted before resort is had to the courts, is not absolute and without exception. *The rules [14] will be departed from in extreme cases, where compliance with the rule would be futile;* where the Statute is charged to be void on its face; . . . or where irreparable injury would result.

"The rule is inapplicable when no administrative remedy is provided. *Likewise, the rule will be relaxed where there is grave doubt as to the availability of the administrative remedy; . . ."* (Emphasis supplied.) 73 *C.J.S., Public Administrative Bodies and Procedure,* § 41, p. 354.

It would appear that both Raike and his attorney sought to have the rule waived or changed through Huddleston as Principal of Rushville High School and as Superintendent of Schools of Rushville Consolidated School Corporation. Huddleston tried but was unable to get the rule changed and left the firm impression that he had been in touch with the school board and the rule would not be waived or changed for Raike. Pursuit of a further hearing at this juncture would have been a nugatory act. *Wolff* v. *Selective Serviec Local Board,* 372 F.2d 817 (2d Cir., 1966) ; *Koepke* v. *Fontecchio,* 177 F.2d 125, (9th Cir., 1949) ; *Jaffee, The Exhaustion of Administrative Remedies,* 12 Buff. L. Rev. 327 (1963).

ISSUE FIVE

Was a Declaratory Judgment rendered by the trial court?

Rushville asserts, without benefit of authority, that the judgment rendered was a "mere statement in summary form" and not a Declaratory Judgment in compliance with IC 1971, 34-4-10-1 (Burns Code Ed.).

Raike replies that the trial court's Findings of Fact and Conclusions of Law are incorporated into the Declaratory Judgment and that taken together there is a specific declaration of Raike's rights.

## ADDITIONAL FACTS

On September 21, 1972, the trial court entered detailed "Court's Findings of Fact and Conclusions of Law", which in turn were incorporated into the Entry of Judgment of the same date, which contained this pertinent language:

". . . and now having entered and adopted its findings of fact and conclusions of law finds the law is with the Plaintiff and against each of the Defendants and *that judgment be entered in favor of the Plaintiff in accordance with the Court's findings of fact and conclusions of law.*" (Emphasis supplied.)

and:

"IT IS ORDERED, ADJUDGED AND DECREED that *a declaratory judgment* and permanent injunction issue against Defendant Indiana High School Athletic Association and Defendant Rushville Consolidated School Corporation *in accordance with the relief prayed for by Plaintiff in his complaint.*

"IT IS FURTHER ORDERED that the Clerk of the Court be, and hereby is further directed to enter judgment on and in accordance with this Order for Plaintiff and against each Defendant, and further, that the Defendants are hereby ordered to pay costs of this action as hereinafter assessed." (Emphasis supplied.)

## DECISION

CONCLUSION—It is our opinion that the Declaratory Judgment is in proper form.

IC 1971, 34-4-10-1 (Burns Code Ed.) reads:[25]

"Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceedings shall be open to objection on the ground that declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declaration shall have the force and effect of a final judgment decree."

Neither this statute nor Trial Rule 57 require the declaration of "rights, status and other legal relations" to be in any particular form . . . only that the declaration "be either affirmative or negative". The Declaratory Judgment of September 21, 1972, incorporated the *detailed* Findings of Fact and Conclusions of Law setting forth the rights and status of the parties, being most specific in this regard.

To hold this Declaratory Judgment defective would be palpably unreasonable.

ISSUE SIX

Did Raike have "clean hands" so as to be entitled to equitable relief?

ADDITIONAL FACTS

On November 27, 1971, Jerry Raike (age 17) married his wife, Paula (age 16), in accordance with the provisions of IC 1971, 31-1-1-1, Ind. Ann. Stat. § 44-101 (Burns Supp. 1974) relating to teenage marriages and approximately two weeks later a child was born of this marriage. Subsequently, on December 16, 1971, Raike brought this action seeking injunctive relief against the appellants.

CONTENTION OF THE PARTIES

Rushville contends that Raike's misconduct ("unclean hands"), consisted of conceiving a child out of wedlock

---

25. Trial Rule 57 provides, inter alia, that "Declaratory relief shall be allowed even though a property right is not involved. Affirmative relief shall be allowed under such remedy when the right thereto is established."

(statutory rape), failing to abide by certain training rules, and reliance on others to support his family.

Raike points to other evidence of his good conduct and that he in all respects complied with the stated public policy of Indiana controlling teenage marriages as reflected in Burns 44-101, *supra.*

## DECISION

CONCLUSION—It is our opinion that there is no merit to Rushville's claim that Raike should be denied relief because of unclean hands.

It is true that one who seeks equitable relief must possess "clean hands", *Traylor* v. *By-Pass 46 Steak House* (1972), 259 Ind. 224, 285 N.E.2d 820, 822; *State ex rel. Uebelhor* v. *Armstrong* (1969), 252 Ind. 351, 360, 248 N.E.2d 32; *State ex rel. Huebner* v. *Burns* (1962), 243 Ind. 424, 428, 186 N.E.2d 424; 12 Ind. Digest, Equity, § 65; 30 C.J.S., EQUITY, § 93.

It is also true that for the clean hands maxim to apply, the party so charged must be guilty of intentional misconduct, *Traylor, supra;* 30 C.J.S., EQUITY, § 93, p. 1013.

The doctrine of unclean hands is reluctantly applied and is scrutinized with a critical eye.[26] 30 C.J.S., EQUITY, § 99, p. 1048.

There is conflicting evidence as to Raike's "misconduct"— not to apply the clean hands doctrine. Furthermore, there is no dispute that Raike in all respects entered into a valid marriage pursuant to a statute designed as a matter of public policy to permit "teenage" marriages to take place under certain specified conditions . . . conditions that Raike met.

We affirm.

Sullivan, P.J. and White, J., concur.

NOTE.—Reported at 329 N.E.2d 66.

---

26. "It [the clean hands doctrine] is not a judicial straitjacket; it does not require that those who invoke equity should have led blameless lives, or operate so as to repel all sinners from a court of equity, nor does it apply to every unconscientious act of a party. . . . [E]quity will consider the conduct of the adversary, the requirements of public policy, and the relation of the misconduct to the subject matter of the suit and to defendant." 30 C.J.S., EQUITY § 98, p. 1034-1035.