Mark D. CROWLEY, Appellant–
Petitioner,

v.

Laura R. CROWLEY, Appellee–
Respondent.

No. 34A04–9712–CV–514.

Court of Appeals of Indiana.

March 30, 1999.

44

Dan J. May, Kokomo, Attorney for Appellant.

Monty K. Woolsey, Miroff, Cross & Klineman, Indianapolis, Attorney for Appellee.

## OPINION

SULLIVAN, Judge

Appellant, Mark D. Crowley (Mark) appeals the trial court's provisional child support and maintenance orders, as well as the division of marital property and order to pay attorney fees, retroactive child support and the maintenance arrearage within its decree dissolving his marriage to Appellee, Laura R. Crowley (Laura).

We affirm in part and reverse in part.

The appellant presents several issues, which we condense and rephrase as follows:

(1) Whether the trial court abused its discretion in entering a provisional child support and maintenance order while Mark was serving overseas in the United States armed forces;

(2) Whether the trial court abused its discretion in ordering an unequal division of the parties' marital property; and

(3) Whether the trial court erred in awarding Laura attorney fees and retroactive child support and by ordering Mark to pay directly to Laura an arrearage of unpaid mortgage payments.

An extensive recitation of the case history and events during pendency of the dissolution is deemed appropriate in light of the various orders at issue.

The parties were married on October 23, 1983. Mark and Laura had two children: A.C., born February 7, 1989, and C.C., born April 21, 1992. The couple separated on February 11, 1996. On March 26, 1996, Mark filed a petition for dissolution of marriage. On that same day, the trial court entered a preliminary restraining order which prevented Mark and Laura from "[t]ransferring, encumbering, concealing, selling or otherwise disposing of any joint property of the parties or assets of the marriage ... without the written consent of the parties or permission of the Court." Record at 19. The court also ordered Laura to refrain from harassing Mark. After the dissolution petition had been filed but before having been served with the dissolution petition and related pleadings, Laura drew cash advances totaling $17,700 on various credit cards owned by the parties and withdrew approximately $8,750 from their joint bank accounts. In addition, Laura allegedly cashed checks payable to Mark in excess of $5,000. She also borrowed approximately $15,000 from her parents.

On April 13, Mark, a practicing physician, who was a Major in the Army Reserve, was ordered to report for active duty on April 29 at Fort Benning in Georgia, for a period not to exceed 140 days. Mark was ultimately stationed overseas in Germany and Bosnia. Citing his call to active military duty, on April 29, Mark filed a motion to pay over or impound all funds withdrawn from the parties' bank accounts and received as cash advances on credit cards. The trial court set a hearing date of May 8 to argue the motion and to consider provisional orders. On May 8, Mark filed a motion to continue, and the trial court agreed to lift the scheduled hearing and reassign the matter to a future date to be established upon request of the parties. Laura filed such a request on June 19, and the trial court assigned the matter for a hearing on July 2. Mark objected to the hearing request and filed another motion for continuance on June 26. In part, Mark's motion stated that he, "has been called to actively serve in the reserves, is now stationed in Germany and ... is entitled to protection under the Soldier's and Sailor's Relief Act since he is on assignment for the U.S. Department of Defense." Record at 35. The motion was granted on June 28. Subsequently, on July 9, the trial court set a hearing date for July 16, in order to determine whether the dissolution action should be stayed pending Mark's active military service. On July 10, Mark filed a motion to show cause, alleging that Laura was continually harassing him in violation of the court's restraining order. The charge was assigned for hearing on July 16, along with the other issues. On July 11, the trial court granted Mark's third request for a continuance and

reset the hearing for July 22. At the July 22 hearing, the trial court scheduled an October 4 date to consider provisional orders.

Laura filed a petition for contempt against Mark on September 19, alleging that Mark had volunteered for active military duty and had requested reassignment so that he could be deployed. She further asserted that Mark had violated the trial court's restraining order by failing to pay his bills for automobile, life and health insurance, and for failing to make payments on various family debts. The contempt petition was also set for hearing on October 4. Two days before the hearing, Mark again filed a motion for a continuance. The motion, supported by affidavits from Mark and his commanding officer overseas, stated that Mark was reassigned to Belgium for an additional 130 days active duty. Mark's personal affidavit listed his salary, together with entitlements, as $2,208.35 semi-monthly.

A hearing was held on October 4, and the trial court entered its provisional orders the following week. In part, the trial court's order dated October 11 stated:

"2. The Court finds that [Mark's] military service and inability to be present does not unduly prejudice the interests of [Mark] as to the determination of the issues of provisional child custody, possession of the marital residence and its contents, and prospective provisional maintenance and support.

* * *

5. The Court further finds that during the provisional period and until further order of the Court, [Mark] shall pay as and in lieu of temporary maintenance, the mortgage payments due [on the parties' marital residence in Kokomo].

6. The Court further finds that during the provisional period and until further order of the Court, [Mark] shall pay child support in the sum of $237.00 per week, beginning October 4, 1996, the amount of said payments having been determined by an application of the Indiana Child Support Guidelines to the following findings:

a. [Mark's] gross weekly average income is $1104.17;

b. [Laura's] imputed gross weekly income is $190.00.

This determination of support is based on [Mark's] affidavit as to his current gross pay, which includes entitlements as well as base pay received.

7. The Court specifically reserves all other issues, including but not limited to the issue of retroactive support, pending further proceedings before the Court." Record at 111–13.

Mark returned to Kokomo from active military duty in mid-December of 1996. On March 10, 1997, Laura filed an affidavit for contempt, contending that Mark had violated the court's provisional orders by failing to make both mortgage and child support payments. On March 14, Laura filed a petition to modify child support. The trial court set the matter for hearing on April 1 but, upon its own motion, reset the hearing for April 3. Mark appeared pro se at the hearing on April 3 and requested a continuance in order to hire counsel. The request was granted and the matter was rescheduled for April 11.

The April 11 hearing addressed both Laura's affidavit for contempt and her petition to modify child support. Mark's request for a continuance of the hearing was denied. In addition, the trial court kept under advisement the issue of retroactive support. Furthermore, the trial court held Mark in indirect civil contempt of its provisional order to pay child support. Finding Mark $3,555 in arrears as to child support, the trial court ordered the suspension of his driver's license as well as his license to practice medicine. However, the trial court decided to withhold its sanctions until April 25, upon the condition that Mark purge his contempt by paying the amount of arrearage in full in addition to the support payments due on the ensuing two Fridays. Moreover, in order to avoid sanctions, Mark was ordered to make arrangements to stop foreclosure proceedings upon the marital home and to file proof of such arrangements with the court. As further sanction, the trial court ordered Mark to the county jail to serve a thirty day sentence, unless the arrearage of mortgage and child support was cured. The sentence was stayed

for fourteen days. Mark was also ordered to pay Laura's attorney fee. Laura was directed to fill out the required tax forms in order to file an amended joint return.

In a written order entered April 15, 1997, the trial court granted Laura's petition to modify child support. In so doing, the trial court concluded:

"4. Since the Court entered its Provisional Order, there has been a substantial change in financial circumstances of the parties, in that [Mark] is no longer in active military service and is engaged in the private practice of medicine. [Laura] remains unemployed, although she testified that she is a registered nurse, who was last employed at a[n] average annual gross wage of $25,000.00.

5. The Court finds that effective April 4, 1997, [Mark's] provisional support order is modified to the sum of $405.00, which amount is determined based on the following findings applied to the Indiana Child Support Guidelines:

a. [Mark's] weekly gross income is $2884.00;

b. [Laura] has an imputed weekly gross income of $480.00."

Record at 140.

On April 25, Mark notified the trial court that he had paid the child support arrearage and had agreed to meet with an attorney representing the bank threatening to foreclose upon the marital residence. Asserting that he was no longer in contempt, he moved to stay the sanctions imposed against him by the trial court. According to Mark, "[t]he current delay in the resolution of the foreclosure [was] the fault of [Laura] and/or her counsel." Record at 161. He further claimed that, "[t]he sanctions of suspension of licenses may only be imposed for the non-payment of child support and not non-payment of debts or mortgages, even if in the nature of spousal maintenance." *Id.* Laura opposed lifting the sanctions, arguing that Mark had failed to make arrangements to stop foreclosure on the marital residence. Mark responded with a motion to show cause

and a motion to terminate the provisional maintenance order.[1] He requested the court to order Laura to get a job in order to support the two children. Further, he contended that, "[t]he October 11, 1996 order required [Mark] to pay the mortgage payment prospectively, not retroactively. [Mark] and [Laura] had an equal duty to pay the mortgage pending this action up and including the date of the provisional order." Record at 150. Mark indicated his refusal to participate in a plan under which he would be liable for the mortgage payments for January 1996 through October 11, 1996, for which he contended Laura was liable. On May 13, Laura requested the court to impose those sanctions previously ordered for Mark's contempt. The trial court on May 19 held a hearing to address these matters.

The trial court entered its written order on May 21, finding in part:

"9. As of May 19, 1997, [Mark] is current with child support payments, although payments have not been made timely as ordered. . . .

10. Indiana [law provides for the suspension of the professional and driver's licenses of those who are] . . . delinquent as a result of an intentional violation of an order for support. . . . The Court finds that said sanctions apply only to the intentional violation of an order for child support, and do not apply to the intentional violation of an order for maintenance. As such, the Court finds that the court's order suspending [Mark's] license to practice medicine and license to drive shall remain withheld as long as [Mark] maintains current support payments.

11. Since the Court's April 11 order, [Mark] has attempted to resolve the foreclosure action, but only by means that do not require him to cure the entire arrearage due. As such, the foreclosure remains pending and the mortgagee is entitled to a judgment if the default is not cured by June 2, 1997.

12. The Court's provisional order of October 11, 1996 requires [Mark] to pay the mortgage payments during the provisional

---

1. In its provisional order of October 11, 1996, the court ordered Mark to pay "as and in lieu of temporary maintenance, the mortgage payments due [on the marital residence]." Record at 112.

period. The issue of retroactive support was reserved. Prior to the parties' separation, [Mark] was the sole earner ($150,-000.00 annually) and by agreement of the parties, [Laura] stayed home and raised the children (since 1992). In determining [Mark's] duty regarding the mortgage payments due prior to October 1996, the Court considers that [Mark] paid no (child or spousal) support from the time of the separation. The Court finds that it is rightfully [Mark's] duty to pay the mortgage payments due prior to October 11, 1996, as retroactively ordered spousal support.

13. The Court further ... finds it appropriate to order a modification of its provisional order so as to avoid duplicitous support/maintenance payments. The Court modifies its provisional order to provide that for monthly mortgage payments due on the marital residence on and after November 1, 1996, [Mark] shall pay 75% of the monthly mortgage payment as spousal maintenance, and [Laura] shall pay 25% of the monthly mortgage payment. For mortgage payments due on and after June 1, 1997, [Mark] shall pay the entire mortgage payment if he is more than one (1) week in arrears with child support.

14. The Court further finds that [Mark] has not purged himself of contempt in regard to stopping the foreclosure action. [Mark's] arguments that he should not be sanctioned, ignores the fact that it was [his] act of financially abandoning his family in February 1996, coupled with his failure to abide by the Court's provisional order that are the principal causes of the impending foreclosure. Given [Mark's] means and financial choices made, the Court does not find credible that he is without resources to cure the mortgage arrearage by lump sum should he choose. [Mark] has demonstrated a clear pattern of giving last priority to the financial needs of his family, unless threatened with sanctions.

15. The Court finds that [Mark] shall purge himself of contempt in regard to the mortgage arrearage by payment in an amount equal to the total monthly mortgage payments (escrow charges and interest included) due prior to November 1, 1996, plus an amount equal to 75% of the monthly mortgage payments (escrow charges and interest included) due November 1, 1996 and after, plus the attorney fees, late fees and other miscellaneous foreclosure costs and penalties, said payment to be made to the mortgagee before June 2, 1997. [Laura] shall pay a sum equal to 25% of the monthly mortgage payments due November 1, 1996 and thereafter as her share of mortgage arrearage, said payment to be made to the mortgagee before June 2, 1997.

\* \* \*

16. The Court withholds judgment on imposing [Mark's] suspended sentence, pending a compliance hearing scheduled for June 3, 1997, 4 p.m. in the Howard Circuit Court." Record at 167–70.

The trial court, except as provided within its order, denied the parties' respective motions and requests.

On June 2, 1997, the parties' marital residence was foreclosed upon in favor of the First National Bank of Kokomo. Laura again requested the immediate imposition of sanctions against Mark. On June 3, Mark filed a notice of his inability to obtain funds to pay the mortgage. He requested a stay of sanctions and a modification of the trial court's order of May 21. Following arguments on June 3, the trial court imposed partial sanctions against Mark. In its order imposing sanctions, the court stated:

"4. At the hearings on April 11, May 19, and June 3, 1997, [Mark] failed to prove that he has taken reasonably diligent and energetic steps to attempt to pay the maintenance payments as ordered. At the compliance hearing scheduled and held on June 3, 1997, [Mark] did not appear, except by counsel. As of June 3, 1997, [Mark] has made no maintenance payments as ordered, and as a result, the mortgage on the marital residence was foreclosed by order entered by Howard Superior Court I in cause 34D01–9702–CP–00067.

5. The Court finds that the suspended sanction for [Mark's] civil contempt should

be and is hereby imposed in part, and the Petitioner Mark D. Crowley is ordered to serve five (5) days in the Howard County Criminal Justice Center beginning June 4, 1997 at 5 p.m., with the remaining term of twenty-five (25) days to remain suspended. [Mark] shall be released the earliest of five (5) days or when he has complied with the court's order as to the payment of maintenance and support.

6. The Court further finds that the Court's order of May 21, 1997 as it requires [Laura] to tender her share of the mortgage arrearage to counsel Dan J. May is rescinded." Record at 190–91.

On July 11, Laura filed an affidavit for contempt and a request to impose sanctions upon Mark. She asserted that Mark had paid nothing towards the monthly mortgage payments on the marital residence and refused to negotiate regarding settlement in dividing the marital property. She asked the court to impose the remaining twenty-five days of his previous sanction for contempt and to set another contempt hearing. The court held a final hearing on all pending issues on July 22. On that same day, Laura filed a request for findings and conclusions pursuant to Ind. Trial Rule 52(A).

The trial court entered its decree of dissolution of marriage on August 11, 1997. Mark was ordered to pay $408.00 per week for child support, based upon Mark's gross weekly wages of $2,884.62 and Laura's imputed gross weekly wages of $480.00. He was further ordered to pay 86% of Laura's child care expenses as well as to maintain health insurance coverage on the children. Mark was awarded real estate owned by the parties in LaPorte, Indiana, and was made responsible for all expenses, taxes, mortgage payments and lien obligations associated with the property. The LaPorte house was assigned a fair market value by the trial court of $219,000, with a recognized debt on the property of $192,000. The trial court awarded various accounts and items of personal property to both parties, as well as ordering the parties to pay for and hold the other harmless for various debts. The trial court did not award Laura spousal maintenance, noting that she had employable skills and

that her decision to attend law school was a choice and not an economic necessity.

Further, the trial court found that Mark was "in arrears the sum of $16,704.50 for temporary maintenance previously ordered to be paid as mortgage payments during the provisional period." Record at 284. In addition, Mark was ordered to pay and hold Laura harmless on the debts due for credit cards, real estate and insurance loans. The trial court specifically found that the obligations to pay these debts were in the nature of support, "as they were incurred due to [Mark's] failure to provide support for his family after February 1996." Record at 285. The trial court observed that it had reserved the issue of support that had accrued prior to its October 11, 1996, provisional order. Laura was ordered to pay and hold Mark harmless for debts owed to Laura's parents, including the $15,000 loan. Mark was further charged with paying $10,000 of Laura's attorney fees, which were to be paid in monthly installments of $500. The award of attorney fees was designated to be "in the nature of support." *Id.* The trial court noted that Mark continued to be in contempt for his willful failure to abide by previous orders and that he would be subject to imposition of his remaining suspended term of incarceration, as well as other penalties, if he failed to make periodic payments on marital debt, child support or the maintenance arrearage. Mark's motion to pay over or impound funds was dismissed, and he was ordered to pay costs in the action. In total, Laura received a net distribution of $98,308.50 (68%) and Mark received $46,105.50 (32%) of the marital estate.

## I. *Provisional Maintenance and Support Order*

Mark claims that the trial court committed reversible error in entering the order for provisional support and maintenance on October 11, 1996. Mark first alleges that the trial court violated his due process rights by refusing to stay proceedings while he was actively serving in the military overseas. Mark invoked the Soldiers' and Sailors' Civil Relief Act of 1940, 50 App. U.S.C. § 521 (1994) (the Act), to support his June 26, 1996, motion for a continuance of the hearing to

consider provisional orders. The Act provides for, at the court's discretion, the staying of actions involving persons serving in the military "unless, in the opinion of the court, the ability of plaintiff to prosecute the action or the defendant to conduct his defense is not materially affected by reason of his military service." The continuance was granted and a hearing was subsequently scheduled for July 16 in order to determine whether the dissolution action should be stayed during Mark's military service. Mark's request to continue the July 16 hearing referred only to his counsel's prior commitment; it failed to mention the Act. The trial court's October 11 provisional orders found that Mark's military service and his corresponding inability to be present did not prejudice his interests as to the issues of provisional child support, possession of the marital residence and its contents, and prospective provisional maintenance and support.

■ We conclude that the trial court did not err in refusing to stay proceedings pursuant to the Act. According to Mark, the trial court never properly entered an order on the requested continuance. He is mistaken. The trial court specifically concluded that Mark was not prejudiced because of his military service. Its October 11 provisional orders served as a determinative ruling on the matter of staying the divorce proceedings under the Act. Under Ind. Appellate Rule 4(B)(1), orders for the payment of money are appealable interlocutory orders. The provisional orders required Mark to pay mortgage payments on the marital home as well as child support. Such provisional orders con-

stituted orders for the payment of money and, thus, were appealable interlocutory orders. *Castor v. Castor* (1975) 165 Ind.App. 520, 333 N.E.2d 124, 126. Mark failed to appeal the provisional orders until September of 1997, a period of almost eleven months from the entry of the provisional orders. Therefore, he is precluded from challenging the appealable interlocutory order on appeal of a final judgment. *Burbach v. Burbach* (1995) Ind.App., 651 N.E.2d 1158, 1162 (citing *Indiana High Sch. Athletic Ass'n v. Raike* (1975) 164 Ind.App. 169, 329 N.E.2d 66, 80 (determining that appellant could not prosecute upon direct appeal alleged defects of temporary injunction when it failed to appeal interlocutory order as "specifically authorized" by App.R. 4(B)(3))).

■ Our conclusion that Mark may not challenge the trial court's provisional orders on direct appeal is further supported by the Indiana Supreme Court's recent decision in *Trojnar v. Trojnar* (1998) Ind., 698 N.E.2d 301. In *Trojnar,* our Supreme Court reversed this court's decision made over a strong dissent by Judge Staton, that App.R. 4(B)(5) [2] implicitly included the mandatory interlocutory appeal of rulings under T.R. 76.[3] *Id.* at 302. The court held that App.R. 4(B)(5) "expressly requires mandatory interlocutory appeals only from decisions involving Trial Rule 75." *Id.* at 303. This conclusion that interlocutory appeals pursuant to App.R. 4(B)(5) are mandatory leads to the corollary conclusion that appeals from orders for the payment of money under App.R. 4(B)(1) are likewise mandatory and may not later be raised upon direct appeal from a final judgment.[4]

2. App.R. 4(B)(5) provides, "appeal from interlocutory orders shall be taken to the Court of Appeals [for] ... [t]ransferring or refusing to transfer a case pursuant to Trial Rule 75." T.R. 75, in turn, addresses venue requirements.

3. T.R. 76 concerns change of venue and change of judge requirements.

4. Even had Mark not waived the issue on appeal, we conclude that the trial court did not abuse its discretion in refusing to stay the divorce proceeding under the Act. "The mere showing that a [plaintiff] is in the military service does not render a continuance mandatory ... in view of the Act's provision authorizing stays unless, in the opinion of the court, the [plaintiff's ability to

prosecute his case] is materially affected by reason of his military service." *Burbach, supra,* 651 N.E.2d at 1162. Mark contends that he could not have perfected an interlocutory appeal while overseas. However, following his call to duty in April of 1996, Mark, through his counsel, on multiple occasions moved for and was granted continuances of the hearing on provisional orders and filed other requests with the court. During the months he was stationed overseas, Mark consistently failed to make support or maintenance payments for his family. Mark filed an affidavit with the court stating that his bimonthly salary, with entitlements, was $2,208.35. The trial court's provisional orders dealt only with matters which could be dealt

■ Mark maintains that the trial court's provisional orders violated Indiana law. I.C. 31–15–4–8(a) (Burns Code Ed. Repl.1997). states that, "[t]he court may issue an order for temporary maintenance or support in such amounts and on such terms that are just and proper." Indiana Child Support Guideline 2 provides: "Temporary maintenance may be awarded by the court not to exceed thirty-five percent (35%) of the obligor's weekly adjusted income. In no case shall child support and temporary maintenance exceed fifty percent (50%) of the obligor's weekly adjusted income." Temporary maintenance and child support may be ordered by the court either in dollar payments or "in-kind" payments of obligations. *Id.* Calculation of a parent's child support obligation under the Child Support Guidelines begins with a determination of the parent's weekly gross income, which includes actual weekly gross income, potential income and imputed income based upon in-kind benefits. Ind. Child Support Guideline 3(A). The obligor's weekly adjusted income is then determined by subtracting from weekly gross income (1) the parent's obligations for pre-

existing orders for child support, (2) reasonable funds for other children the parent has a legal duty to support, (3) costs for providing children health insurance, and (4) amounts for alimony ordered in decrees from foreign jurisdictions arising from a prior marriage. *Id.* at 3(C). Applying this methodology to the instant facts, the trial court's provisional orders required Mark to pay less than fifty percent of his weekly adjusted income as child support and temporary maintenance.[5] Thus, the provisional orders did not violate Indiana law.

■ Mark challenges his indirect civil contempt citation as violating Article I, Section 22 of the Indiana Constitution, which provides, "there shall be no imprisonment for debt, except in case of fraud." We disagree. "Whether a party is in contempt of court is a matter left to the discretion of the trial court. We reverse a trial court's finding of contempt only if it is against the logic and effect of the facts and circumstances before the court and any reasonable inferences arising therefrom." *Crowl v. Berryhill* (1997) Ind.App.,

with fairly without Mark's presence—child custody, support, mortgage payments and possession of the marital home and property. Mark has failed to demonstrate how his absence from the hearing on provisional orders prejudiced him. The trial court used only the salary figure provided by Mark in his verified affidavit in determining his income for the purpose of calculating child support. To the extent Mark asks that we reweigh the evidence before the trial court, we decline to do so.

5. Mark's gross weekly income was found by the court to be $1,104.17. This figure is one-half of the $2,208.35 semi-monthly salary which Mark stipulated to in his verified affidavit. According to Mark, his semi-monthly salary included entitlements. Prior to the order, Mark had no support or maintenance obligations to subtract from his gross weekly income in order to arrive at his weekly adjusted income. Therefore, his weekly adjusted income was also $1,104.17. Pursuant to the provisional orders, Mark was obligated to pay weekly child support of $237 and the weekly maintenance payment of $290.21 (one-quarter of the monthly mortgage payment of $1,160.85). Mark's temporary maintenance and support payments totaled $527.21, which is approximately 48% of his gross weekly income. The court's award did not breach the Child Support Guidelines' 50% cap.

Furthermore, the trial court did not err in its calculation of Mark's child support obligation

pursuant to the Guidelines. Such calculation by the court pursuant to the Child Support Guidelines is presumptively valid. *Marmaduke v. Marmaduke* (1994) Ind.App., 640 N.E.2d 441, 443, *trans. denied.* It will be reversed only where the determination is clearly erroneous. *Truman v. Truman* (1994) Ind.App., 642 N.E.2d 230, 235. Thus, the trial court's calculation will be affirmed unless it is clearly against the logic and effect of the facts and circumstances which were before the court. *Id.* The trial court's provisional orders stated that the child support order of $237 per week was based upon Indiana's Child Support Guidelines. The court imputed a weekly income of $190 to Laura. The parties' combined weekly adjusted income was 1,294.17. Applying the guideline schedules for weekly support payments, the basic child support obligation for the two children was $279, which was also the total child support obligation under the Child Support Guidelines. Because Mark earned 85% of the weekly adjusted income, he was obligated to pay that percentage of the basic child support, approximately $237. The trial court's calculation was not clearly erroneous. Mark's use of net income to support his argument is inappropriate and misguided. *See* Commentary to Ind. Child Support Guideline 1 ("One of the policy decisions made . . . in the early stages of developing the Guidelines was to use a gross income approach as opposed to a net income approach.").

678 N.E.2d 828, 830 (citation omitted). "Indirect contempts arise from matters not occurring in the presence of the court, but which obstruct or defeat the administration of justice such as failure or refusal of a party to obey a court order, injunction or decree." *Hegedus v. Hegedus* (1978) 178 Ind.App. 620, 383 N.E.2d 446, 447 n. 1. "A civil contempt is a violation of a court order resulting in a proceeding for the benefit of the aggrieved party." *Mitchell v. Stevenson* (1997) Ind.App., 677 N.E.2d 551, 560, *trans. denied.* "The primary objective of a civil contempt proceeding is not to punish the defendant, but to coerce action for the benefit of the aggrieved party. Thus, any type of remedy in a civil contempt proceeding must be coercive or remedial in nature." *National Educ. Ass'n—South Bend v. South Bend Community Sch. Corp.* (1995) 655 N.E.2d 516, 522 (citations omitted). An order to pay maintenance is enforceable by contempt. *DeMichieli v. DeMichieli* (1992) Ind.App., 585 N.E.2d 297, 301 (citing *Thompson v. Thompson* (1984) Ind.App., 458 N.E.2d 298), *disapproved of on other grounds, Pettit v. Pettit* (1993) Ind., 626 N.E.2d 444, 447.

Mark was imprisoned for failure to pay the provisional order for maintenance, i.e. mortgage payments on the marital residence.[6] In its order imposing sanctions, the trial court found that, based upon the evidence submitted, Mark "had and has the ability to pay the support and maintenance payments ordered, and that he had either willfully refused or failed to take reasonably diligent and energetic steps to attempt to accomplish what was ordered." Record at 190. Mark asserts that, upon returning from overseas, his credit "was shot" from Laura's "maxing out" of the

parties' credit cards. Appellant's Brief at 17. However, Mark had returned from his military service in mid-December of 1996. The trial court found Mark in contempt four months later, in April of 1997. Although the trial court found that Mark was earning a gross income of $2,884 per week (approximately $150,000 per year), Mark had paid no child support at the time and was $3,555 in arrears. He had made no mortgage payments on the marital home. In addition, during the provisional period until December of 1996, Mark had made monthly mortgage payments of approximately $1,900 on other real estate, located in LaPorte, Indiana. In July of 1996, Mark contracted to purchase a new BMW automobile for $32,000. At least until April of 1997, Mark remained current with payments on the vehicle. In April of 1996, Mark purchased a diamond ring for $3,248.90; he consistently made payments on the ring. Furthermore, Mark made regular payments on other obligations, including his rent and a large screen television. Evidence reasonably supports the trial court's conclusion that Mark had resources available to him with which to purge the contempt finding.

Moreover, the trial court imposed the imprisonment sanction for only five of the thirty days initially ordered, after Mark received notice of the contempt citation and received an opportunity to be heard thereon. In so doing, the court gave Mark the means to release himself early—by making his maintenance and support payments. The sanction sought to motivate Mark to provide the ordered benefit to Laura. Thus, the sanctions were coercive, not punitive, in nature.[7] Mark received a reasonable and just

---

**6.** The trial court's order of May 21, 1997, found that Mark had purged his contempt finding as to the child support arrearage. His subsequent incarceration therefore was based solely upon his failure to pay maintenance in the form of mortgage payments.

**7.** Mark does not specifically challenge the fact that the original sanction was for a determinate period of thirty days. However, it is appropriate to note that ordinarily such determinate sentences are deemed to be more in the nature of punishment, as is appropriate in criminal contempt proceedings, than coercive in nature, as is the purpose of a civil contempt determination.

*See National Educ. Ass'n., supra,* 655 N.E.2d at 522; *see also Pickett v. Pelican Service Associates* (1986) Ind.App., 495 N.E.2d 245, 247 (finding ninety day sentence for civil contempt to be improper because it "was neither coercive [n]or remedial in nature"), *reh'g denied.* Where confinement can have no coercive effect, it is clearly inappropriate in a civil contempt setting. *Hancz v. City of South Bend* (1998) Ind.App., 691 N.E.2d 1322, 1325; *see also Mitchell, supra,* 677 N.E.2d at. 560. However, not every order of incarceration, even if seeming to be for a determinate period, is precluded in a civil contempt. If as stated in *Moore v. Ferguson* (1997) Ind.App., 680 N.E.2d 862, 865, *trans. denied,* "the court

opportunity to purge himself of contempt but failed to avail himself of the opportunity. The trial court did not err by imposing the sanction of imprisonment.[8]

▇▇ Mark further asserts that the trial court's provisional orders violated various protections found in both the United States and Indiana Constitutions, as well as in various state statutes.[9] However, his Appellant's Brief lacks any citations to case law supporting his contentions and, in a single paragraph, makes only a vague argument that the trial court committed fundamental error by failing to observe Mark's protections from unreasonable seizure of his person and property, to recognize his right to be free of involuntary servitude, to allow Mark to enjoy the necessary comforts of life and to exempt a reasonable amount of his property from seizure, and to follow state law as set forth in statute. Mark has failed to meet his burden demonstrating fundamental error under any provision cited by him. Indeed, excluding Article I, Section 22 of the Indiana Constitution, which we discussed *supra*, Mark has failed to indicate how most of the cited provisions are even relevant to the case at hand,

to demonstrate how he was prejudiced by any alleged constitutional or statutory violations, or indicate how the alleged errors were beyond his own corrective powers before the trial court. *See, e.g. Clouse v. Fielder* (1982) Ind.App., 431 N.E.2d 148, 157–58 (observing that "fundamental error" results only where a statement is made or an act is done which results in prejudicial error that goes to the very heart of a party's case and where such statement or act is wholly outside the corrective powers of the party), *reh'g denied.* Therefore, we find that the trial court committed no fundamental error in issuing and enforcing its provisional orders.

## II. *Division of Marital Estate*

▇▇ Mark argues that the trial court abused its discretion in providing for an unequal division of the marital estate in its divorce decree. The distribution of marital assets is traditionally a matter within the sound discretion of the trial court. *Wells v. Collins* (1997) Ind.App., 679 N.E.2d 915, 916. I.C. 31–15–7–5 (Burns Code Ed. Repl.1997) creates a rebuttable presumption that an

[provides] that the imprisonment cease as soon as the act [commanded] is done, so that the defendant has 'the key of his prison in his own pocket,' " it is permissible. Here, as noted, Mark was only required to serve five of the thirty days ordered, and he could have avoided incarceration altogether had he made the ordered payments. It is clear therefore that the order of incarceration was for coercive purposes, even though the period in jail certainly had a punitive component.

**8.** Although also not raised by Mark in his brief, we note that the trial court may have arguably failed to observe a procedural provision set forth in I.C. 34-4-7-8 (Burns Code Ed. Repl.1986 & Supp.1997). *Repealed by* Acts 1998, P.L. 1, § 221. For present provision, *see* I.C. 34-47-3-5 (Burns Code Ed. Repl.1998). The provision required, among other things, that, "[i]n all cases of indirect contempts, the person charged therewith shall be entitled, before answering thereto, or being punished therefor, to have served upon him a rule of the court...." In the instant case, the record does not reflect that the trial court issued a rule to show cause prior to Mark's contempt citation. While the technical requisites of the statute may not have been followed, we conclude that Mark's substantial rights were not violated due to any oversight. The citation for contempt filed by Laura on March 10, 1997, clearly established the bases for her request— Mark's failure to pay child support and mortgage

payments on the marital residence. At the hearing on the contempt request on April 11, 1997, Mark admitted to having failed to make mortgage payments pursuant to the trial court's order of October 11, 1996. Mark had sufficient notice of the contempt allegations and had an opportunity to respond thereto, with the assistance of counsel. His due process rights were not violated. *See Mitchell v. Stevenson* (1997) Ind.App., 677 N.E.2d 551, 560–61 (due process rights of party found in contempt for violating court order and held in confinement for ninety days were not violated where court failed to issue a rule to show cause but party had notice of contempt charge and subsequently admitted, prior to trial, to having committed the contemptuous acts).

**9.** Mark cites the following: IND. CONST. art. VII, § 7 & art. I, §§ 11–17, 19–22; I.C. 24-4.5-5-105(4); I.C. 31-2-7-2; I.C. 31-2-11-8 & -10; I.C. 33-6-1-10; I.C. 34-4-1-21; I.C. 34-4-7-3 & -8; and I.C. 34-4-8-1. I.C. 31-2 was repealed by Acts 1997, P.L. 1, § 157. For present provisions, *see generally* I.C. 31-16-16 (Burns Code Ed. Repl.1997). I.C. 34-4 was repealed by Acts 1998, P.L. 1, § 221. For present provisions, *see* I.C. 34-57-1-22 and I.C. 34-47-3-1, -5 & -7 (Burns Code Ed. Repl.1998). Mark failed to cite any specific provision of the United States Constitution.

equal division of marital property is just and reasonable. The presumption may be rebutted by, among other things, evidence of the conduct of the parties during the marriage as related to the disposition or dissipation of property and evidence of the parties' earnings or earning ability as related to a final division of property or a final determination of the parties' property rights. *Id.* The trial court is presumed to have followed the law and considered all appropriate factors in arriving at its decision. *Wells, supra,* at 916. The party challenging the trial court's property division must overcome a strong presumption that the court considered and complied with statutory requirements. *Id.*

 Upon reviewing a claim that a trial court improperly divided marital property, we must decide whether the trial court's decision constitutes an abuse of discretion. *Hurst v. Hurst* (1997) Ind.App., 676 N.E.2d 413, 414. An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We neither reweigh the evidence nor judge the credibility of the witnesses. *Breeden v. Breeden* (1997) Ind.App., 678 N.E.2d 423, 427. Instead, we only consider the evidence most favorable to the trial court's judgment and the reasonable inferences to be drawn therefrom. *Id.*

 In the instant case, the trial court entered findings and conclusions. First, we must ascertain whether the evidence supports the findings, and, second, whether the findings support the judgment.

*Breeden, supra,* 678 N.E.2d at 425. The judgment will be reversed only where it is clearly erroneous. *Id.* Findings are clearly erroneous if the record lacks any evidence or reasonable inferences to support them. *Id.*

 The trial court, in its finding twenty-six, determined, "[d]uring the marriage each of the parties has contributed to the marital union and estate, although the Court considers that [Mark] has far superior earning capabilities which justifies an award of more than fifty percent (50%) of marital property to [Laura]."[10] Record at 273. This finding is supported by the evidence. At the time of dissolution, Mark grossed approximately $150,000 per year as a doctor who had been certified in internal medicine and who had completed a cardiology fellowship program. He remained in the military reserve. Laura held a nursing degree with earning potential of approximately $25,000 per year. However, she had not worked full-time since 1989 and had not worked part-time since 1992. Thus, the evidence supports the trial court's finding that Mark's earning capabilities far exceeded those of Laura.

The court's findings were sufficient to support its judgment. Further, the trial court did not abuse its discretion in providing for an unequal division of marital property. Its division of marital property was not clearly against the logic and effect of the facts and circumstances before the court.[11] *See Breeden, supra,* 678 N.E.2d at 427 (concluding that trial court did not abuse its discretion by awarding wife 60% of marital assets where

---

10. In finding of fact twenty-seven, the trial court further observed that, during the provisional period, both parties—with Mark bearing the greater responsibility—contributed to dissipation of the marital assets. Mark failed to make mortgage payments and neglected to pay child support for thirteen months, while expending funds for expensive gifts and a car. Laura refrained from seeking or engaging in employment and declined to use cash advances from the credit cards or funds from the parties' joint bank accounts to make mortgage payments due on the marital residence. These facts are supported by evidence in the record. To the extent dissipation of marital assets was a factor in the trial court's decision, it merely lent support to the trial court's decision to award Laura the greater share of marital property.

11. Mark challenges the trial court's finding that the LaPorte residence, which was awarded to him, had a net equity of $27,000. The court valued the property at $219,000, and the home had a debt of $192,000 at the time of dissolution. "The trial court has broad discretion in ascertaining the value of property in a dissolution action, and its valuation will not be disturbed absent an abuse of that discretion." *Hiser v. Hiser* (1998) Ind.App., 692 N.E.2d 925, 927. At the final hearing on July 22, 1997, Laura testified that she and Mark had received an offer on the LaPorte home for $219,000 in November of 1995. Mark testified that the highest offer had been $200,000. As of April, 1997, the debt on the LaPorte residence was approximately $192,000. The trial court did not abuse its discretion in valuing the net equity of the LaPorte home.

husband earned $800 per week and the wife earned $260).

## III. *Attorney Fees, Retroactive Child Support & Temporary Maintenance*

### A. *Attorney Fees*

Mark challenges the award of $10,000 in attorney fees to Laura. The trial court characterized the award as being in the nature of child support. However, such award is more appropriately to be considered separate and distinct from child support.[12] That being the case, the award was nevertheless proper. A trial court may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending a dissolution action.[13] "A trial court enjoys broad discretion in assessing attorney's fees in dissolution cases." *Russell v. Russell* (1998) Ind.App., 693 N.E.2d 980, 984, *trans. denied.* The Indiana Supreme Court, in *Selke v. Selke* (1992) Ind., 600 N.E.2d 100, 102 (citations omitted), observed:

"Trial courts enjoy broad discretion in awarding allowances for attorney's fees. Reversal is proper only where the trial court's award is clearly against the logic and effect of the facts and circumstances before the court. In assessing attorney's fees, the court may consider such factors as the amount of assets awarded to the parties, the relative earning ability of the parties, and which party initiated the action."

As noted *supra,* evidence supports the trial court's finding that Mark's earning capabilities far exceeded Laura's. Furthermore, Mark requested continuances on several occasions, thus requiring Laura to incur additional attorney expenses in responding to the delays. In addition, Laura was compelled to pursue collection of child support and maintenance from Mark through requests for contempt findings because of Mark's persistent failures to meet his obligations. Laura incurred $15,307.50 in attorney fees. Based upon the facts, the trial court did not abuse its discretion in ordering Mark to pay approximately two-thirds of Laura's attorney fees. The trial court mistakenly deemed the attorney fees award to be in the nature of child support. However, such error is harmless. Although not enforceable via contempt, the award is valid.

### B. *Retroactive Child Support*

Mark further claims that the trial court erred in ordering him to pay the credit card debt incurred by Laura on the parties' joint cards. He argues that, if the award was in fact in the nature of support, the trial court failed to make a proper finding justifying deviation from the presumed amount called for by the Child Support Guidelines. In its October 11 provisional order, the trial court specifically reserved "the issue of retroactive child support." Record at 113. The divorce decree of August 11, 1997, stated:

"The Court finds that [Mark] shall pay and hold [Laura] harmless on the debts due for credit cards, real estate, and insurance loans. The Court specifically finds that [Mark's] obligations to pay these debts, and in particular those credit card debts that accrued during the provisional period, are in the nature of support, as they were incurred due to [Mark's] failure to provide support for his family after February 1996. These obligations are deemed to be a component of support since the Court had reserved the issue of support that accrued prior to its provisional order of October 11, 1996. The Court also finds that if [Mark] fails to pay these debts, that burden will be forced on [Laura], and it would materially effect [Laura's] ability to provide and support the parties' children in her custody." Record at 284–85.

Mark's payment of the parties' credit card debt thus constituted an award of retroactive

---

12. If the attorney fees award in fact constituted child support, the trial court would have had to follow Ind. Child Support Guideline 3 and stated a factual bases for its deviation. The trial court's statement that, if Mark failed to pay the fees, then Laura's ability to provide for and support her minor children would be "materially affected" is not sufficient to rebut the presumption that the amount dictated by the Child Support Guidelines is appropriate. The trial court also would have had to incorporate the fees award into the calculation of Mark's weekly child support obligation.

13. I.C. 31-15-10-1 (Burns Code Ed. Repl.1997).

child support from February to October of 1996. However, in reaching its calculation, the trial court did not apply the Indiana Child Support Guidelines. On appeal, Mark essentially challenges whether the trial court erred in awarding Laura retroactive child support without applying the Child Support Guidelines.

 The Indiana Child Support Guidelines are presumptively applicable in determining the amount of a retroactive child support award. *In re A.J.R.* (1998) Ind.App., 702 N.E.2d 355, 361 (citing *In re A.D.W.* (1998) Ind.App., 693 N.E.2d 576, 579).[14] A party seeking deviation from the guidelines must overcome this presumption by showing that the application of the guidelines would be unjust or inappropriate. *Id.* The amount of retroactive support is determined in light of the circumstances of each case and consistent with standards generally governing child support awards, including the Child Support Guidelines. *Id.*

Evidence does support the trial court's conclusion that Mark failed to support his family following the parties separation in February of 1996. Moreover, payment of the credit card debt is not an inappropriate form of support under the circumstances.[15] However, the Child Support Guidelines were not applied in determining the retroactive support in the instant case. We are unable to determine whether they were followed or deviated from. If the trial court's award did deviate from the Child Support Guidelines, we are unable to ascertain to what extent they did so. The trial court would have to enter written findings justifying any deviation from the Guidelines pursuant to Ind. Child Support Guideline 3(F)(2).[16]

Laura has failed to successfully rebut the presumption that the Guidelines apply to the award for retroactive child support.[17] We therefore reverse the trial court's order requiring Mark to pay the parties' credit card debt. Further, we remand this issue to the trial court for a determination of retroactive child support consistent with the Child Support Guidelines or for proper written findings justifying any deviation therefrom.

*C. Temporary Maintenance Arrearage*

 Finally, Mark maintains that the trial court erred in ordering him to pay to Laura the value of the maintenance arrearage. Mark suggests that the order was clearly erroneous because the debt was discharged upon foreclosure of the marital residence. The trial court found Mark "in arrears the sum of $16,704.50 for temporary maintenance previously ordered to be paid as mortgage payments during the provisional period." Record at 284. The provisional order required Mark to pay the mortgage payments on the marital residence "as and in lieu of temporary maintenance." Record at 112. The trial court subsequently clarified

---

**14.** We note that both *A.J.R.* and *A.D.W.* involve retroactive child support in the context of paternity actions. Orders in dissolution proceedings are not strictly analogous to those in paternity cases. Nevertheless, we conclude that, in light of this court's prior application of Child Support Guidelines to retroactive child support orders, a retroactive order was appropriate in the instant case, especially when considering the fact that the trial court—as will often be the case—did not have access to one party's financial information for some time following the filing of the dissolution petition.

**15.** We note that Ind. Child Support Guideline 2 allows both maintenance and child support payments to be made as in-kind payments of obligations. Payments of credit card debts qualify as such an in-kind payment. Moreover, the Commentary to Guideline 2 states that in-kind payments should be included in calculating the percentage limitations of the obligor's weekly adjusted income provided in the Child Support Guidelines.

**16.** This provision allows deviation from the child support amount calculated pursuant to the Child Support Guidelines if the amount is found unjust or inappropriate after consideration of the factors in I.C. 31–1–11.5–12(a) & (b). I.C. 31–1–11.5 was repealed by Acts 1997, P.L. 1, § 157. For the present provisions, *see* I.C. 31–16–6–1 & –2 (Burns Code Ed. Repl.1997).

**17.** Laura does contend that, based upon evidence presented at the final hearing on July 22, 1997, the trial court would have been authorized to order more provisional child support than it actually did. But she acknowledges that it would not be possible to determine the precise amount of additional child support that the court could have ordered. In any event, her argument is not sufficient to overcome the presumption that the Child Support Guidelines should have been applied.

and modified its provisional order by stating that Mark was responsible for the total monthly mortgage payments due prior to November 1, 1996, as well as 75% of prospective payments on and after November 1, 1996. In its May 21, 1997, order, the trial court characterized the mortgage payments due prior to October 11, 1996, as "retroactively ordered spousal support." Record at 168. The temporary maintenance awarded to Laura was in the form of mortgage payments made to the First National Bank of Kokomo, as opposed to dollar payments made directly to Laura.

The Indiana Supreme Court, in *Bartrom v. Adjustment Bureau, Inc.* (1993) Ind. 618 N.E.2d 1, 5 (citations omitted), recognized that, "the duty of spousal support is clearly embedded in Indiana's modern law of domestic relations." The court further observed that "[p]rotecting [financially] dependant spouses and ensuring their continued sustenance is the objective of Indiana's marital duty of support." *Id.* at 6. In addition, the *Bartrom* court noted that, "[t]he existence of temporary maintenance ... buttresses the proposition that the duty of spousal support survives the filing of a petition for dissolution, since such maintenance is nothing more than a post hoc judicial determination of the extent of the superior spouse's ongoing support obligation." *Id.* at 9. In the instant case, it is true that the parties no longer owe a monthly mortgage payment to the First National Bank of Kokomo for the marital residence. However, the order to pay the mortgage as temporary maintenance constituted an obligation due Laura, not to the bank. Mark was merely ordered to pay the bank funds for the mortgage instead of making dollar payments to Laura to ensure her continued sustenance.

Mark failed to make any of the court ordered payments. As the court noted, he "demonstrated a clear pattern of giving last priority to the financial needs of his family, unless threatened with sanctions." Record at 169. To allow Mark now to escape payments for the temporary maintenance order imposed by the court would in essence award him for the wilful dereliction of his duty of support toward Laura as well as toward the two children. It would also undermine and essentially overturn the trial court's decision finding Mark in contempt for failure to make the maintenance payments. Moreover, Mark cannot be successfully heard to argue that making good on the temporary maintenance even now would not benefit Laura and his children in the manner intended by the trial court. The arrearage award would likely help Laura establish and maintain a residence for her and the parties' two minor children.

The duration of provisional support orders is committed to the sound discretion of the trial court. *Moore v. Moore* (1998) Ind.App., 695 N.E.2d 1004, 1009. Provisional orders terminate upon issuance of the final dissolution decree. I.C. 31–15–4–14 (Burns Code Ed. Repl.1997). In the instant case, Mark's obligation to pay the amount of the monthly mortgage payment did not cease until the August 11, 1997 dissolution decree. Because Mark failed to make the ordered mortgage payments, Laura lost the benefit of such payments for the several months leading up the dissolution decree. The trial court was allowed to award her the benefit of the accrued payments upon dissolution. Thus, the trial court did not abuse its discretion in ordering payment of the temporary maintenance arrearage.

In summation, we conclude that the trial court did not err in ordering provisional support and maintenance or in ordering an unequal division of the parties' marital property. We further conclude that the trial court, within its decree of dissolution, properly ordered Mark to pay $10,000 of Laura's attorney fees as well as the arrearage of the temporary maintenance. However, because the trial court erred in ordering payment of retroactive child support in the form of payment of the parties' credit card debt without first applying the Indiana Child Support Guidelines, we reverse the trial court's decision on that issue alone and remand to the trial court for further proceedings consistent with this opinion.

SHARPNACK, C.J., and BROOK, J., concur.