ATTORNEYS FOR APPELLANT:
**GREGORY F. ZOELLER**
ATTORNEY GENERAL OF INDIANA
**EVAN W. BARTEL**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

ATTORNEY FOR APPELLEE:
**DONALD W. SHELMON**
ATTORNEY AT LAW
Rensselaer, IN

FILED

Nov 07 2016, 3:43 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| INDIANA DEPARTMENT OF STATE REVENUE, INHERITANCE TAX DIVISION, ) ) ) | |
| Appellant, ) | |
| ) | Cause No. 49T10-1207-TA-00038 |
| v. ) | |
| ) | |
| THE ESTATE OF ORVILLE J. RAUCH, ) | |
| ) | |
| Appellee. ) | |

ON APPEAL FROM THE JASPER CIRCUIT COURT
The Honorable John D. Potter, Judge
Cause No. 37C01-1011-EU-000688

**FOR PUBLICATION**
**November 7, 2016**

WENTWORTH, J.

The Indiana Department of State Revenue, Inheritance Tax Division appeals the Jasper Circuit Court's (Probate Court) order determining the inheritance tax liability of The Estate of Orville J. Rauch. The Department asserts that the Probate Court erred when it decided that beneficiaries Robert and Claudia Wandless were Class A transferees because they had an <u>in loco parentis</u> relationship with the deceased. The Court affirms.

**FACTS AND PROCEDURAL HISTORY**

Orville J. Rauch was born on December 22, 1930. He never married and had no children. He owned farmland in Illinois and farmed most of his life. Orville lived with his parents until their deaths, but other family members were not evident in his life, although two of his cousins attended his funeral. When Orville was in his 40's, he had a stroke after which he had a hard time walking.

Around or about the early 1970's, Orville met and befriended two young neighbor children: Robert Wandless and Claudia L'Ecuyer. Orville met Robert when Robert was about 10 years old, visiting him at Robert's home while he was farming with his father. Robert lived with his natural parents, but Orville gave him advice, direction, and even discipline, treating him just the same as did Robert's natural parents. Indeed, Orville referred to Robert as his son in the presence of others, and he took Robert out to eat a couple of times a week. Sometimes Orville would pay Robert to do tasks, but Orville expected Robert to help him fill planters and do other tasks without compensation. Nonetheless, Orville was never Robert's legal guardian, never claimed Robert as a dependent for tax or census purposes, and had no legal authority to control Robert's actions.

Orville met Claudia when she was about 12 years old. Claudia lived with her natural parents, and Orville regularly visited her at her home "to see how everybody was" as often as five times a week. (See Hr'g Tr. 6, Mar. 7, 2012.) Orville drove over to her house in his truck, but he did not get out a lot because he used a walker - so she went out to see him. Orville attended every one of Claudia's family affairs, birthday parties, and holiday events. At least a couple of days a week, he had supper with

2

Claudia and her family, and he always gave her gifts. Throughout their relationship, Orville often gave Claudia advice, direction, and correction. Indeed, Orville treated her no differently than her parents did, and she treated him "just like a parent . . . if he needed something, we took care of him." (Hr'g Tr. 8.) Although Orville told "[p]retty much everybody" that Claudia was his daughter "[t]o the day he died[,]" he was never her legal guardian nor did he have any legal authority over her. (See Hr'g Tr. 9.) Claudia called him "Buddy," because calling him that made him laugh, and she considered him "just as much a parent [to her] as [her] own." (See Hr'g Tr. 7, 13.)

Robert and Claudia married when they were 19 years old. At that time, Orville provided for them "in much the same manner a father would for his children by turning over farming operations to them on very favorable terms." (Appellant's App., Vol. I at 4.) In return, they took care of all his financial matters and farmed his land under a 50/50 crop sharing agreement until his death.

Orville referred to Robert and Claudia's children as "his grandchildren[.]" (Hr'g Tr. 12.) In fact, he gave, or attempted to give, his belongings to Claudia, Robert, and their children throughout his life, making specific requests that their children get certain of his possessions that were passed down from his family. Moreover, one of their children lived with Orville for a two-year period between 2003 and 2005.

Orville wanted to give Claudia and Robert his interest in his Illinois farmland, but Robert refused because he did not want any of Orville's extended family to say that he and Claudia were taking Orville, his belongings, and all his possessions away from them. While Orville was living in a nursing home in Illinois, he decided to sell his Illinois real estate and invest the proceeds in farmland where the parcels would be all together

3

in the same vicinity.  He would not sign the papers for the sale of his Illinois property, however, until Claudia and Robert promised to take him with them wherever they went.  Upon the purchase of farmland in Indiana, Orville, Claudia, Robert, and their children all moved to this state.

Orville spent the last twenty years of his life in nursing homes.  When he was in a nursing home in Illinois, Claudia visited him "two or three days a week; when [they all] moved to Indiana, [Claudia] actually worked at the [Indiana] nursing home, so [they] had lunch [together] every day and [she] stay[ed] with him in the afternoon . . . watch[ing] his favorite movies[.]" (Hr'g Tr. 11.)  Robert did not visit him as much as Claudia, but did so as much as he could.  "Nursing home staff noted that Orville treated [Robert] and Claudia as his children, and <u>vice versa</u>." (Appellant's App., Vol. I at 4.) Furthermore, relatives, neighbors, and business associates of Orville testified that he had a fatherly relationship with Robert and Claudia, and "in turn, [they] took care of him as adult children would an elder parent." (Appellant's App., Vol. I at 4-5.)

When Orville passed away on October 25, 2010, Robert and Claudia made all of his funeral arrangements.  Their children placed a pillow with the word "Grandpa" on it inside his casket.  Upon his death, Orville left the majority of his estate to Robert and Claudia.

On September 29, 2011, Orville's Estate filed its inheritance tax return reporting, among other things, that Robert and Claudia were his children <u>in loco parentis</u>. (<u>See</u> Appellant's App., Vol. II at 25-44.)  As a result, the Estate treated Robert and Claudia as Class A transferees in computing its inheritance tax liability. (<u>See</u> Appellant's App., Vol. II at 26.)  On September 30, 2011, the Probate Court accepted, as filed, the Estate's

inheritance tax return. (Compare Appellant's App., Vol. I at 2 with Appellant's App., Vol. II at 45.)

On January 27, 2012, the Department filed a "Petition for Rehearing and Redetermination of Inheritance Tax" with the Probate Court. (Appellant's App., Vol. I at 8-9.) In its Petition, the Department asserted that the Estate had not shown that Orville took the place of Robert and Claudia's natural parents or that he had the rights, duties, and responsibilities of a parent as required for an in loco parentis relationship under Indiana Code § 6-4.1-3(e) and 45 Indiana Administrative Code 6-4.1-10 ("45 IAC 6-4.1-10"). (Appellant's App., Vol. I at 9.) Accordingly, the Department claimed that Robert and Claudia should have been classified as Class C transferees, not Class A transferees, and the Estate owed an additional $512,919.68 in inheritance tax plus interest. (Appellant's App., Vol. I at 9.)

On May 23, 2012, after holding a hearing, the Probate Court issued an order denying the Department's Petition. (Appellant's App., Vol. I at 4.) The Probate Court stated:

> The Court finds and concludes that Orville Rauch considered himself in the role of the father to [Robert] and Claudia Wandless – and discharged a natural obligation above and beyond the duty of a parent by financially providing for [them], and leaving his legacy, farmland, to them as if they were his children whom would normally inherit the land. Claudia and [Robert] Wandless should be granted Class A Transferee status under the statutory in loco parentis exception.

(Appellant's App., Vol. I at 6.) On June 22, 2012, the Department filed a Motion to Correct Error with the Probate Court, which was subsequently denied. (Appellant's App., Vol. I at 3, 7.)

The Department appealed to this Court on July 23, 2012. The Court conducted

5

oral argument on March 1, 2013.  Additional facts will be supplied as necessary.

**STANDARD OF REVIEW**

The Indiana Tax Court acts as a true appellate tribunal when it reviews an appeal of a probate court's determination concerning the amount of Indiana inheritance tax due.  IND. CODE § 6-4.1-7-7 (2016); In re Estate of Young, 851 N.E.2d 393, 395 (Ind. Tax Ct. 2006).  "On appeal, the court will not reweigh the evidence nor judge the credibility of witnesses, but will affirm the probate court's judgment upon any legal theory supported by evidence introduced at trial."  Indiana Dep't of State Revenue v. Estate of Baldwin, 652 N.E.2d 124, 125 (Ind. Tax Ct. 1995) (citing Estate of Hibbs v. Indiana Dep't of State Revenue, 636 N.E.2d 204, 206 (Ind. Tax Ct. 1994)).  Accordingly, the Court affords a probate court great deference in its role as the finder of fact, but reviews its legal conclusions de novo.  In re Estate of Young, 851 N.E.2d at 395.

**LAW**

In Indiana, "[a]n inheritance tax is imposed at the time of a decedent's death on certain property interest transfers made by him."  IND. CODE § 6-4.1-2-1 (2010) (amended 2012).  This tax "is not a tax on the property of [the] decedent's estate, but a tax on the privilege of succeeding to [the] property rights of the deceased."  In re Estate of McNicholas v. State of Indiana, 580 N.E.2d 978, 980-81 (Ind. Ct. App. 1991) (citation omitted), trans. denied.

Generally, the amount of inheritance tax due on each of the decedent's transfers is based on the fair market value (as of the date of the decedent's death) of the property interests transferred.  See IND. CODE §§ 6-4.1-5-1.5(a) (2010).  The General Assembly has, however, provided specific exemptions that lower the amount of inheritance tax

due based on the classification of the transferee's relationship with the decedent.  See

IND. CODE § 6-4.1-5-1 (2010).  For instance, "[t]he first one hundred thousand dollars

($100,000) of property interests transferred to a Class A transferee . . . is exempt from

the inheritance tax[,]" while only the first $500 of property interests transferred to a

Class B transferee and the first $100 of property interests transferred to a Class C

transferee, are exempt from inheritance tax.  IND. CODE §§ 6-4.1-3-10 (2010) (amended

2012); see also IND. CODE §§ 6-4.1-3-11, -12 (2010).

Indiana Code § 6-4.1-1-3 defines the three classes of transferees as follows:

(a) "Class A transferee" means a transferee who is a:

(1) lineal ancestor of the transferor;
(2) lineal descendant of the transferor;
(3) stepchild of the transferor, whether or not the stepchild is
adopted by the transferor; or
(4) lineal descendant of a stepchild of the transferor, whether
or not the stepchild is adopted by the transferor.

(b) "Class B transferee" means a transferee who is a:

(1) brother or sister of the transferor;
(2) descendant of a brother or sister of the transferor; or
(3) spouse, widow, or widower of a child of the transferor.

(c) "Class C transferee" means a transferee, except a surviving
spouse, who is neither a Class A nor a Class B transferee.

IND. CODE § 6-4.1-1-3(a)-(c) (2010) (amended 2012).  In addition, a transferee who is

not the natural child of the transferor is deemed to be a natural child of the transferor,

and thus a Class A transferee for inheritance tax purposes, in two separate contexts.

First, a non-relative is considered the natural child of adoptive parents even if the

biological parents are alive because adoption formalities, if done before emancipation,

divest the biological parents of all legal rights, duties, and obligations to the adopted

7

child. In re Estate of Quackenbush, 926 N.E.2d 127, 130 (Ind. Tax Ct. 2010). Second, a non-relative is considered a Class A transferee "if a relationship of loco parentis has existed for at least ten (10) years and if the relationship began before the child's fifteenth birthday[.]" I.C. § 6-4.1-1-3(e) (emphasis added). Although the statute does not define the term "loco parentis," the Department has defined the term to mean "a person who takes the place of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities." 45 IND. ADMIN. CODE 4.1-1-10(a) (2010) (see http://www.in.gov/legislative/iac/).

## ANALYSIS

On appeal, the Department contends that the Probate Court erred in finding that Orville had an in loco parentis relationship with Claudia and Robert and thus erred in granting them Class A Transferee status. (See Appellant's Br. at 14.) The Department reasons 1) that Orville's behavior was inconsistent with the plain meaning of the term "in loco parentis," having neither taken the place of Claudia and Robert's natural parents nor assumed the legal rights, duties, and responsibilities of a parent; and 2) that the facts show that Orville was their friend, not a parent. (See Appellant's Br. at 7-14.)

1.

The Department claims that the Probate Court erred in construing the statutory language of Indiana § 6-4.1-1-3(e) and 45 IAC 4.1-1-10(a) strictly against the Department, rather than applying the words and phrases in their plain, ordinary, and usual sense. (Appellant's Br. at 7-8.) The Department acknowledges that the critical term "loco parentis" used to define Class A transferees is not defined in the statute, but contends that the plain meaning of 45 IAC 4.1-1-10(a) contains the controlling definition.

8

(Appellant's Br. at 8-9.)

An undefined statutory phrase requires a court to apply the rules of construction to determine its meaning. See 1 Stop Auto Sales, Inc. v. Indiana Dep't of State Revenue, 785 N.E.2d 672, 674 (Ind. Tax Ct. 2003), rev'd on other grounds, 810 N.E.2d 686 (Ind. 2004) (stating that when a word in a statute is undefined by statute or case law, the Court gives the word its plain and ordinary meaning and may refer to a dictionary). Webster's Dictionary defines in loco parentis as "in the place of a parent[.]" WEBSTER'S THIRD NEW INT'L DICTIONARY 1165 (2002 ed.). See also BLACK'S LAW DICTIONARY 858 (9th ed.) (stating that "in loco parentis" means "[o]f, relating to, or acting as a temporary guarding or caretaker of a child, taking on all or some of the responsibilities of a parent"). Accordingly, the Department's definition of in loco parentis in its regulation 45 IAC 4.1-1-10(a) does not appear to be inconsistent with the dictionary definition.

Indiana case law breathes life into the plain meaning of the term. At common law, an in loco parentis relationship exists when "'a person [] has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties.'" See In re Marriage of Snow v. England, 862 N.E.2d 664, 666 (Ind. 2007) (citation omitted). Significantly, therefore, an in loco parentis relationship is based on intent. Id. Moreover, because the relationship requires an intent to continue, the status is "temporary in nature and essentially voluntary." Id. at 667.

Nearly 150 years ago, our Supreme Court explained that the test for in loco

9

parentis is "'whether the circumstances, taken in the aggregate, amount to moral certainty that a _testator considered himself_ in the place of the child's father, and as _meaning to_ discharge that natural obligation which it was the duty of a parent to perform.'" See Weston v. Johnson, 48 Ind. 1, 6 (Ind. 1874) (emphases added). The Court does not find a requirement that the natural parents be dead or that a testator must assume _all_ the obligations and duties of a natural parent to have an _in loco parentis_ relationship, in contrast to the requirements discussed above for a non-relative adoptee.[1] Indeed, the Supreme Court clearly instructed that the focus in determining whether an _in loco parentis_ relationship exists is the intent of the testator, stating "putative fathers, are not to be considered _in loco parentum_ unless they have _intended_ to assume the office and duty of a parent." Id. at 5-6 (emphasis added) (citation omitted).

The Probate Court found and concluded "that Orville Rauch considered himself in the role of the father to [Robert] and Claudia Wandless[.]" (Appellant's App., Vol. I at 6.) Moreover, the Probate Court found that Orville "discharged a natural obligation above and beyond the duty of a parent by financially providing for [Robert] and Claudia, and leaving his legacy, farmland, to them as if they were his children whom would normally inherit the land." (Appellant's App., Vol. I at 6.) Therefore, the Probate

---

[1] The existence of a natural parent with parental rights and duties is not necessarily fatal to a determination of in loco parentis. See, e.g., Sturrup v. Mahan, 305 N.E.2d 877, 881-82 (Ind. 1974) (finding a student who moved from his parent's Florida home to live with his adult brother in Indiana and was appointed his legal guardian had an in loco parentis relationship), overruled on on other grounds, 694 N.E.2d 222 (Ind. 1997); Weston v. Johnson, 48 Ind. 1, 6 (Ind. 1874) (finding that the existence of a natural father was not relevant in determining no in loco parentis relationship existed); Indiana Dep't of State Revenue v. Nat'l Bank of Logansport, 402 N.E.2d 1008, 1010 (Ind. Ct. App. 1980) (holding a legatee was a Class A transferee of her in loco parentis stepmother as well as her natural mother). Accordingly, these facts are not bright line legal standards, but are subject to a trial court's duty to weigh evidence and judge credibility.

Court's findings are based on the intent of the testator and are not inconsistent with the plain meaning of the term in loco parentis.

The Department argues in the alternative that the statute at issue concerns the application of an exemption that should be construed in favor of the state and against Robert and Claudia. (See Appellant's Br. at 10.) The statute at issue, however, is not an exemption statute. Indiana Code § 6-4.1-1-3 is located in chapter 1 of Indiana's Inheritance Tax Code, which contains definitions and rules of construction that apply throughout the Code. See IND. CODE § 6-4.1-1-1 (2010). Accordingly, it is not an exemption statute subject to the above rule of construction. Moreover, finding otherwise would defeat the long-standing general principle that the Inheritance Tax Act is to be interpreted and construed in favor of the taxpayer. Indiana Dep't of State Revenue v. Nat'l Bank of Logansport, 402 N.E.2d 1008, 1010 (Ind. Ct. App. 1980); see also In re Cassner's Estate, 325 N.E.2d 487, 492 (Ind. Ct. App. 1975) (stating that "the words of exemption found in the [Inheritance Tax] Statute should be liberally construed in favor of the taxpayer").

2.

The Department further claims that the Probate Court erred in determining that Orville had an in loco parentis relationship with Claudia and Robert because the facts show his relationship was that of a friend, not a parent. (Appellant's Br. at 10-14.) In support, the Department points to several facts it claims are antithetic to finding an in loco parentis relationship. (Appellant's Br. at 12.) For example, neither Robert nor Claudia ever lived with Orville, Orville had no legal authority over them, and they both maintained close relationships with their natural parents that Orville did not replace.

11

(Appellant's Br. at 12.)

An in loco parentis relationship "embodies more than furnishing material help to a close relative who is in need. One may be willing to furnish needed assistance to such a relative, even over an indefinite period of time, without being willing at the same time to assume the legal obligation of a parent." Niewiadomski v. United States, 159 F.2d 683, 686 (6th Cir. 1947); see also Weston, 48 Ind. at 6 (explaining that providing assistance to a relative is so usual that it cannot not raise a clear inference that the testator intended to substitute himself in loco parentis). It is the province, however, of the Probate Court, not the Tax Court, to weigh the evidence. Horlock v. Oglesby, 231 N.E.2d 810, 815 (Ind. 1967); see also Estate of Hibbs, 636 N.E.2d at 206.

The Probate Court identified facts that clearly demonstrated Orville's intent to be a father to Robert and Claudia and his intent to assume obligations of a parent by financially providing for them, while the facts recited by the Department had tenuous connections to Orville's intent. Accordingly, the Tax Court holds that the Probate Court provided substantial evidence of probative value to support its judgment. Furthermore, the Tax Court holds that the Probate Court applied the proper legal standard based on the intent of the testator in determining that an in loco parentis relationship existed for purposes of the inheritance tax.

**CONCLUSION**

For the reasons stated above, the Court affirms the Probate Court's order that Claudia and Robert Wandless had an in loco parentis relationship with the deceased, Orville J. Rauch, from before they were 15 years old until his death and are thus Class A transferees regarding the inheritance tax liability of his estate.